BOARD OF DIRECTORS OF ROTARY INTERNA-
TIONAL ET AL. *v.* ROTARY CLUB OF DUARTE ET AL.

No. 86–421.   Argued March 30, 1987—Decided May 4, 1987

POWELL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. SCALIA, J., concurred in the judgment. BLACKMUN and O'CONNOR, JJ., took no part in the consideration or decision of the case.

*William P. Sutter* argued the cause for appellants. With him on the briefs were *Peter F. Lovato III* and *Wm. John Kennedy.*

*Judith Resnik* argued the cause for appellees. On the brief were *Carol Agate, Sanford K. Smith, Blanche C. Bersch, Paul Hoffman,* and *Fred Okrand.*

*Marian M. Johnston* argued the cause for intervenor State of California. With her on the brief were *John K. Van de Kamp,* Attorney General, *Andrea Sheridan Ordin,* Chief Assistant Attorney General, and *Beverly Tucker,* Deputy Attorney General.*

---

*Briefs of *amici curiae* urging reversal were filed for the Boy Scouts of America by *Ronald C. Redcay, George A. Davidson,* and *David K. Park;* for the Conference of Private Organizations by *Thomas P. Ondeck;* for the

JUSTICE POWELL delivered the opinion of the Court.

We must decide whether a California statute that requires California Rotary Clubs to admit women members violates the First Amendment.

## I

### A

Rotary International (International) is a nonprofit corporation founded in 1905, with headquarters in Evanston, Illinois. It is "an organization of business and professional men united worldwide who provide humanitarian service, encourage high ethical standards in all vocations, and help build goodwill and peace in the world." Rotary Manual of Procedure 7 (1981) (hereinafter Manual), App. 35. Individual members belong to a local Rotary Club rather than to International. In turn, each local Rotary Club is a member of International. *Ibid.* In August 1982, shortly before the trial in this case, Inter-

Legal Foundation of America by *Jean F. Powers* and *David Crump;* and for Pilot Club International et al. by *Stephen G. Seliger.*

Briefs of *amici curiae* urging affirmance were filed for the State of Minnesota et al. by *Hubert H. Humphrey III,* Attorney General of Minnesota, *Richard S. Slowes,* Assistant Solicitor General, and *Peter M. Ackerberg,* Special Assistant Attorney General, and for the Attorneys General for their respective States as follows: *Joseph I. Lieberman* of Connecticut, *Neil F. Hartigan* of Illinois, *William J. Guste* of Louisiana, *W. Cary Edwards* of New Jersey, *Anthony J. Celebrezze, Jr.,* of Ohio, *Dave Frohnmayer* of Oregon, *Jim Mattox* of Texas, *David L. Wilkinson* of Utah, and *Donald S. Hanaway* of Wisconsin; for the city of New York et al. by *Doron Gopstein* and *Leonard Koerner;* for the American Jewish Congress et al. by *Marc D. Stern;* for the Anti-defamation League of B'nai B'rith by *Abigail T. Kelman, Justin J. Finger, Jeffrey P. Sinensky, Steven M. Freeman,* and *Meyer Eisenberg;* for California Women Lawyers et al. by *Lorraine L. Loder* and *Fredric D. Woocher;* for the Kiwanis Club of Ridgewood, Inc., et al. by *Marcia K. Baer;* for the Lloyd Lyons Club by *Marla J. McGeorge* and *Allen T. Murphy, Jr.;* and for the Rotary Club of Seattle et al. by *M. Margaret McKeown* and *Eugene C. Chellis.*

*Joan M. Graff* and *Douglas R. Young* filed a brief for the Employment Law Center of the Legal Aid Society of San Francisco as *amicus curiae.*

national comprised 19,788 Rotary Clubs in 157 countries, with a total membership of about 907,750. Brief for Appellants 7.

Individuals are admitted to membership in a Rotary Club according to a "classification system." The purpose of this system is to ensure "that each Rotary Club includes a representative of every worthy and recognized business, professional, or institutional activity in the community." 2 Rotary Basic Library, Club Service 67–69 (1981), App. 86. Each active member must work in a leadership capacity in his business or profession. The general rule is that "one active member is admitted for each classification, but he, in turn, may propose an additional active member, who must be in the same business or professional classification."[1] Id., at 7, App. 86. Thus, each classification may be represented by two active members. In addition, "senior active" and "past service" members may represent the same classifications as active members. See Standard Rotary Club Constitution, Art. V, §§ 2–5, Record 97–98. There is no limit to the number of clergymen, journalists, or diplomats who may be admitted to membership. Manual 31, 33, App. 38–39.

Subject to these requirements, each local Rotary Club is free to adopt its own rules and procedures for admitting new members. Id., at 7, App. 35. International has promulgated Recommended Club By-laws providing that candidates for membership will be considered by both a "classifications committee" and a "membership committee." The classifications committee determines whether the candidate's business or profession is described accurately and fits an "open" classification. The membership committee evaluates the candidate's "character, business and social standing, and general

---

[1] Rotary Clubs may establish separate classifications for subcategories of a business or profession as long as the classification "describe[s] the member's principal and recognized professional activity . . . ." 2 Rotary Basic Library, Club Service 8 (1981), App. 87. For example, a single Rotary Club may admit categories and subcategories of lawyers: e. g., trial, corporate, tax, labor, and so on. Ibid.

eligibility." Brief for Appellants 7–8. If any member objects to the candidate's admission, the final decision is made by the club's board of directors.

Membership in Rotary Clubs is open only to men. Standard Rotary Club Constitution, Art. V, § 2, Record 97. Herbert A. Pigman, the General Secretary of Rotary International, testified that the exclusion of women results in an "aspect of fellowship . . . that is enjoyed by the present male membership," App. to Juris. Statement G–52, and also allows Rotary to operate effectively in foreign countries with varied cultures and social mores. Although women are not admitted to membership, they are permitted to attend meetings, give speeches, and receive awards. Women relatives of Rotary members may form their own associations, and are authorized to wear the Rotary lapel pin. Young women between 14 and 28 years of age may join Interact or Rotaract, organizations sponsored by Rotary International.

## B

In 1977 the Rotary Club of Duarte, California, admitted Donna Bogart, Mary Lou Elliott, and Rosemary Freitag to active membership. International notified the Duarte Club that admitting women members is contrary to the Rotary constitution. After an internal hearing, International's board of directors revoked the charter of the Duarte Club and terminated its membership in Rotary International. The Duarte Club's appeal to the International Convention was unsuccessful.

The Duarte Club and two of its women members filed a complaint in the California Superior Court for the County of Los Angeles. The complaint alleged, *inter alia*, that appellants' actions violated the Unruh Civil Rights Act, Cal. Civ. Code Ann. § 51 (West 1982).[2] Appellees sought to enjoin

---

[2] The Unruh Civil Rights Act provides, in part:

"All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, or national origin

International from enforcing its restrictions against admitting women members, revoking the Duarte Club's charter, or compelling delivery of the charter to any representative of International. Appellees also sought a declaration that appellants' actions had violated the Unruh Act. After a bench trial, the court concluded that neither Rotary International nor the Duarte Club is a "business establishment" within the meaning of the Unruh Act. The court recognized that "some individual Rotarians derive sufficient business advantage from Rotary to warrant deduction of Rotarian expenses in income tax calculations, or to warrant payment of those expenses by their employers . . . ." App. to Juris. Statement B–3. But it found that "such business benefits are incidental to the principal purposes of the association . . . to promote fellowship . . . and . . . 'service' activities." *Ibid.* The court also found that Rotary clubs do not provide their members with goods, services, or facilities. On the basis of these findings and conclusions, the court entered judgment for International.

The California Court of Appeal reversed. 178 Cal. App. 3d 1035, 224 Cal. Rptr. 213 (1986). It held that both Rotary International and the Duarte Rotary Club are business establishments subject to the provisions of the Unruh Act. For purposes of the Act, a " 'business' embraces everything about which one can be employed," and an "establishment" includes "not only a fixed location, . . . but also a permanent 'commercial force or organization' or a 'permanent settled position (as in life or business).' " *O'Connor* v. *Village Green Owners Assn.*, 33 Cal. 3d 790, 795, 662 P. 2d 427, 430 (1983) (quoting *Burks* v. *Poppy Construction Co.*, 57 Cal. 2d 463, 468–469, 370 P. 2d 313, 316 (1962)). The Court of Appeal identified several "businesslike attributes" of Rotary International, including its complex structure, large staff and budget, and ex-

---

are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code Ann. § 51 (West 1982).

tensive publishing activities. The court held that the trial court had erred in finding that the business advantages afforded by membership in a local Rotary Club are merely incidental. It stated that testimony by members of the Duarte Club "leaves no doubt that business concerns are a motivating factor in joining local clubs," and that "business benefits [are] enjoyed and capitalized upon by Rotarians and their businesses or employers." 178 Cal. App. 3d, at 1057, 224 Cal. Rptr., at 226. The Court of Appeal rejected the trial court's finding that the Duarte Club does not provide goods, services, or facilities to its members. In particular, the court noted that members receive copies of the Rotary magazine and numerous other Rotary publications, are entitled to wear and display the Rotary emblem, and may attend conferences that teach managerial and professional techniques.

The court also held that membership in Rotary International or the Duarte Club does not give rise to a "continuous, personal, and social" relationship that "take[s] place more or less outside public view." *Ibid.* (internal quotation marks and citations omitted). The court further concluded that admitting women to the Duarte Club would not seriously interfere with the objectives of Rotary International. Finally, the court rejected appellants' argument that their policy of excluding women is protected by the First Amendment principles set out in *Roberts* v. *United States Jaycees*, 468 U. S. 609 (1984). It observed that "[n]othing we have said prevents, or can prevent, International from adopting or attempting to enforce membership rules or restrictions outside of this state." *Id.*, at 1066, 224 Cal. Rptr., at 231. The court ordered appellants to reinstate the Duarte Club as a member of Rotary International, and permanently enjoined them from enforcing or attempting to enforce the gender requirement against the Duarte Club.

The California Supreme Court denied appellants' petition for review. We postponed consideration of our jurisdiction to the hearing on the merits. 479 U. S. 929 (1986). We

conclude that we have appellate jurisdiction,[3] and affirm the judgment of the Court of Appeal.

## II

In *Roberts* v. *United States Jaycees, supra,* we upheld against First Amendment challenge a Minnesota statute that required the Jaycees to admit women as full voting members. *Roberts* provides the framework for analyzing appellants' constitutional claims. As we observed in *Roberts,* our cases have afforded constitutional protection to freedom of association in two distinct senses. First, the Court has held that the Constitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships. Second, the Court has upheld the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities. In many cases, government interference with one form of protected association will also burden the other form of association. In *Roberts* we determined the nature and degree of constitutional protection by considering separately the effect of the challenged state action on individuals' free-

---

[3] We have appellate jurisdiction to review a final judgment entered by the highest court of a State in which decision could be had "where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution, treaties or laws of the United States, and the decision is in favor of its validity." 28 U. S. C. § 1257(2). Appellants squarely challenged the constitutionality of the Unruh Act, as applied, and the Court of Appeal sustained the validity of the statute as applied. "We have held consistently that a state statute is sustained within the meaning of § 1257(2) when a state court holds it applicable to a particular set of facts as against the contention that such application is invalid on federal grounds." *Japan Line, Ltd.* v. *County of Los Angeles,* 441 U. S. 434, 441 (1979) (citing *Cohen* v. *California,* 403 U. S. 15, 17–18 (1971); *Warren Trading Post* v. *Arizona Tax Comm'n,* 380 U. S. 685, 686, and n. 1 (1965); *Bantam Books, Inc.* v. *Sullivan,* 372 U. S. 58, 61, n. 3 (1963); *Dahnke-Walker Milling Co.* v. *Bondurant,* 257 U. S. 282, 288–290 (1921)).

dom of private association and their freedom of expressive association. We follow the same course in this case.[4]

## A

The Court has recognized that the freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights. Such relationships may take various forms, including the most intimate. See *Moore* v. *East Cleveland,* 431 U. S. 494, 503–504 (1977) (plurality opinion). We have not attempted to mark the precise boundaries of this type of constitutional protection. The intimate relationships to which we have accorded constitutional protection include marriage, *Zablocki* v. *Redhail,* 434 U. S. 374, 383–386 (1978); the begetting and bearing of children, *Carey* v. *Population Services International,* 431 U. S. 678, 684–686 (1977); child rearing and education, *Pierce* v. *Society of Sisters,* 268 U. S. 510, 534–535 (1925); and cohabitation with relatives, *Moore* v. *East Cleveland, supra,* at 503–504. Of course, we have not held that constitutional protection is restricted to relationships among family members. We have emphasized that the First Amendment protects those relationships, including family relationships, that presuppose "deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Roberts* v. *United States Jaycees, supra,* at 619–620. But in *Roberts* we observed that "[d]etermining the limits of state authority over an individual's freedom to enter into a particular association . . . unavoidably entails a careful

---

[4] International, an association of thousands of local Rotary Clubs, can claim no constitutionally protected right of private association. Moreover, its expressive activities are quite limited. See *infra,* at 548–549. Because the Court of Appeal held that the Duarte Rotary Club also is a business establishment subject to the provisions of the Unruh Act, we proceed to consider whether application of the Unruh Act violates the rights of members of local Rotary Clubs.

assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." 468 U. S., at 620 (citing *Runyon* v. *McCrary,* 427 U. S. 160, 187–189 (1976) (POWELL, J., concurring)). In determining whether a particular association is sufficiently personal or private to warrant constitutional protection, we consider factors such as size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship. 468 U. S., at 620.

The evidence in this case indicates that the relationship among Rotary Club members is not the kind of intimate or private relation that warrants constitutional protection. The size of local Rotary Clubs ranges from fewer than 20 to more than 900. App. to Juris. Statement G–15 (deposition of Herbert A. Pigman, General Secretary of Rotary International). There is no upper limit on the membership of any local Rotary Club. About 10 percent of the membership of a typical club moves away or drops out during a typical year. 2 Rotary Basic Library, Club Service 9–11 (1981), App. 88. The clubs therefore are instructed to "keep a flow of prospects coming" to make up for the attrition and gradually to enlarge the membership. *Ibid.* The purpose of Rotary "is to produce an inclusive, not exclusive, membership, making possible the recognition of all useful local occupations, and enabling the club to be a true cross section of the business and professional life of the community." 1 Rotary Basic Library, Focus on Rotary 60–61 (1981), App. 84. The membership undertakes a variety of service projects designed to aid the community, to raise the standards of the members' businesses and professions, and to improve international relations.[5] Such an in-

---

[5] We of course recognize that Rotary Clubs, like similar organizations, perform useful and important community services. Rotary Clubs in the vicinity of the Duarte Club have provided meals and transportation to the elderly, vocational guidance for high school students, a swimming program for handicapped children, and international exchange programs, among many other service activities. Record 217H–217J.

clusive "fellowship for service based on diversity of interest," *ibid.*, however beneficial to the members and to those they serve, does not suggest the kind of private or personal relationship to which we have accorded protection under the First Amendment. To be sure, membership in Rotary Clubs is not open to the general public. But each club is instructed to include in its membership "all fully qualified prospective members located within its territory," to avoid "arbitrary limits on the number of members in the club," and to "establish and maintain a membership growth pattern." Manual 139, App. 61–62.

Many of the Rotary Clubs' central activities are carried on in the presence of strangers. Rotary Clubs are required to admit any member of any other Rotary Club to their meetings. Members are encouraged to invite business associates and competitors to meetings. At some Rotary Clubs, the visitors number "in the tens and twenties each week." App. to Juris. Statement G–24 (deposition of Herbert A. Pigman, General Secretary of Rotary International). Joint meetings with the members of other organizations, and other joint activities, are permitted. The clubs are encouraged to seek coverage of their meetings and activities in local newspapers. In sum, Rotary Clubs, rather than carrying on their activities in an atmosphere of privacy, seek to keep their "windows and doors open to the whole world," 1 Rotary Basic Library, Focus on Rotary 60–61 (1981), App. 85. We therefore conclude that application of the Unruh Act to local Rotary Clubs does not interfere unduly with the members' freedom of private association.[6]

---

[6] Appellants assert that we "approved" a distinction between the Jaycees and the Kiwanis Club in *Roberts* v. *United States Jaycees*, 468 U. S. 609, 630 (1984). Brief for Appellants 21. Appellants misconstrue *Roberts*. In that case we observed that the Minnesota court had suggested Kiwanis Clubs were outside the scope of the State's public accommodations law. We concluded that this refuted the Jaycees' arguments that the Minnesota statute was vague and overbroad. We did not consider whether the relationship among members of the Kiwanis Club was sufficiently intimate or private to warrant constitutional protection. Similarly,

## B

The Court also has recognized that the right to engage in activities protected by the First Amendment implies "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts* v. *United States Jaycees*, 468 U. S., at 622. See *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 907–909, 932–933 (1982). For this reason, "[i]mpediments to the exercise of one's right to choose one's associates can violate the right of association protected by the First Amendment . . . ." *Hishon* v. *King & Spalding*, 467 U. S. 69, 80, n. 4 (1984) (POWELL, J., concurring) (citing *NAACP* v. *Button*, 371 U. S. 415 (1963); *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449 (1958)). In this case, however, the evidence fails to demonstrate that admitting women to Rotary Clubs will affect in any significant way the existing members' ability to carry out their various purposes.

As a matter of policy, Rotary Clubs do not take positions on "public questions," including political or international issues. Manual 115, App. 58–59. To be sure, Rotary Clubs engage in a variety of commendable service activities that are protected by the First Amendment. But the Unruh Act does not require the clubs to abandon or alter any of these activities. It does not require them to abandon their basic goals of humanitarian service, high ethical standards in all vocations, good will, and peace. Nor does it require them to abandon their classification system or admit members who do not reflect a cross section of the community. Indeed, by

---

we have no occasion in this case to consider the extent to which tne First Amendment protects the right of individuals to associate in the many clubs and other entities with selective membership that are found throughout the country. Whether the "zone of privacy" established by the First Amendment extends to a particular club or entity requires a careful inquiry into the objective characteristics of the particular relationships at issue. *Roberts* v. *United States Jaycees, supra*, at 620. Cf. *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163, 179–180 (1972) (Douglas, J., dissenting).

opening membership to leading business and professional women in the community, Rotary Clubs are likely to obtain a more representative cross section of community leaders with a broadened capacity for service.[7]

Even if the Unruh Act does work some slight infringement on Rotary members' right of expressive association, that infringement is justified because it serves the State's compelling interest in eliminating discrimination against women. See *Buckley* v. *Valeo*, 424 U. S. 1, 25 (1976) *(per curiam)* (right of association may be limited by state regulations necessary to serve a compelling interest unrelated to the suppression of ideas). On its face the Unruh Act, like the Minnesota public accommodations law we considered in *Roberts*, makes no distinctions on the basis of the organization's viewpoint. Moreover, public accommodations laws "plainly serv[e] compelling state interests of the highest order." 468 U. S., at 624. In *Roberts* we recognized that the State's compelling interest in assuring equal access to women extends to the acquisition of leadership skills and business contacts as well as tangible goods and services. *Id.*, at 626. The Unruh Act plainly serves this interest. We therefore hold that application of the Unruh Act to California Rotary Clubs does not violate the right of expressive association afforded by the First Amendment.[8]

### III

Finally, appellants contend that the Unruh Act is unconstitutionally vague and overbroad. We conclude that these contentions were not properly presented to the state courts.

---

[7] In 1980 women were reported to make up 40.6 percent of the managerial and professional labor force in the United States. U. S. Department of Commerce, Statistical Abstract of the United States 400 (1986).

[8] Appellants assert that admission of women will impair Rotary's effectiveness as an international organization. This argument is undercut by the fact that the legal effect of the judgment of the California Court of Appeal is limited to the State of California. See *supra*, at 543. Appellants' argument also is undermined by the fact that women already attend the Rotary Clubs' meetings and participate in many of their activities.

It is well settled that this Court will not review a final judgment of a state court unless "the record as a whole shows either expressly or by clear implication that the federal claim was adequately presented in the state system." *Webb* v. *Webb*, 451 U. S. 493, 496–497 (1981). Appellants did not present the issues squarely to the state courts until they filed their petition for rehearing with the Court of Appeal. The court denied the petition without opinion. When "'"the highest state court has failed to pass upon a federal question, it will be assumed that the omission was due to want of proper presentation in the state courts, unless the aggrieved party in this Court can affirmatively show the contrary."'" *Exxon Corp.* v. *Eagerton*, 462 U. S. 176, 181, n. 3 (1983) (quoting *Fuller* v. *Oregon*, 417 U. S. 40, 50, n. 11 (1974) (in turn quoting *Street* v. *New York*, 394 U. S. 576, 582 (1969))). Appellants have made no such showing in this case.[9]

## IV

The judgment of the Court of Appeal of California is affirmed.

*It is so ordered.*

JUSTICE SCALIA concurs in the judgment.

JUSTICE BLACKMUN and JUSTICE O'CONNOR took no part in the consideration or decision of this case.

---

[9] Appellants point to a passage in the brief they filed in the California Court of Appeal that quotes this Court's opinion in *NAACP* v. *Button*, 371 U. S. 415, 435 (1963): "'It is enough [for unconstitutionality] that a vague and broad statute lends itself to selective enforcement against unpopular causes.'" Brief for Respondents in B001663 (Cal. Ct. App.), p. 26 (brackets in original) (quoted in Brief for Appellants 37–37). The quotation occurs in the course of an argument that the Unruh Act should be applied only to memberships in entities that are a vehicle for the public sale of goods, services, or commercial advantages. This casual reference to a federal case, in the midst of an unrelated argument, is insufficient to inform a state court that it has been presented with a claim subject to our appellate jurisdiction under 28 U. S. C. § 1257(2).