Kathryn SMITH, Katherine Buggert, Lawrence Berg, and Nellie Berg, Petitioners,

v.

The DISTRICT COURT, SECOND JUDI-CIAL DISTRICT; City and County of Denver and State of Colorado; Hon. James C. Flanigan, Senior Judge; Hon. Leslie M. Lawson, Former Judge; and Calvary Temple, Inc., a Colorado corporation, Charles E. Blair, Joan Bjork, J. Allan Petersen, and John Humphreys, individually and as trustees, Respondents.

No. 90SA49.

Supreme Court of Colorado, En Banc.

May 29, 1990.

As Modified on Denial of Rehearing June 18, 1990.

Daniel F. Lynch, Denver, for petitioners.

Hall & Evans, Raymond J. Connell, Steve Shappell, Denver, for respondents Calvary Temple, Inc., Charles E. Blair, Joan Bjork, J. Allan Petersen, and John Humphreys.

Justice VOLLACK delivered the Opinion of the Court.

Petitioners initiated this original proceeding pursuant to C.A.R. 21 to seek reversal of two district court orders, which denied petitioners' request to certify a class pursuant to C.R.C.P. 23 and denied their motion to compel production of a list of individuals who donated money to a Calvary Temple, Inc., (Calvary Temple) fund. We issued a rule to show cause, and make the rule absolute.

## I.

Prior to 1974 the petitioners (Investors) invested money in Life Center, Inc., (Life Center), a residential care facility owned and operated by the Calvary Temple church. In 1974, Life Center and Charles E. Blair Foundation, Inc., (Foundation), which raised money for Life Center, filed for bankruptcy. In 1989 the final proceeds from the sale of Life Center's assets were distributed to creditors; a federal bankruptcy court discharged the remaining $6 million of unpaid debts. The bankruptcy court approved the Foundation's reorganization plan in which Calvary Temple would raise $50,000 twice each year toward payment of the principal of investments made by the Foundation's unsecured creditors.

In 1986, Calvary Temple initiated a fundraising project titled "Second Mile Campaign." Calvary Temple stated that the campaign was intended to pay $3,924,000 to 787 investors and creditors to whom Life Center and the Foundation owed money prior to Life Center's request in bankruptcy court for protection from creditors.

A Calvary Temple brochure describing how the campaign would operate stated, "On the church sanctuary wall, a visual of the Second Mile is portrayed. Each cobblestone is covered by a footprint representing one of the distressed investors." The brochure also stated that each donation would be "used in its entirety for the Second Mile project." The brochure invited individuals to designate the recipient of their donations by selecting a "footprint," on which were printed monetary amounts. Calvary Temple also announced to donors that their names would appear on a permanent "honor roll" to be painted on a Calvary Temple church wall. During the campaign, Calvary Temple officials in church sermons read excerpts of letters from donors and identified the donors and the amounts of their donations, and church publications regularly identified various donors and the amount of their donations. Calvary Temple deposited donations to the campaign in a restrict-

ed account titled "Calvary Temple Second Mile Fund."

In December 1987 the Investors filed this lawsuit in Denver County District Court against Calvary Temple and four Calvary Temple officials, requesting an accounting and alleging numerous claims for relief, including fraud and breach of fiduciary duty. In the lawsuit the Investors alleged that Calvary Temple wrongfully disbursed monies to businesses and individuals who were not among the 787 investors whom the Second Mile Campaign was created to reimburse.

In October 1989 the district court judge denied the Investors' motion to designate a class pursuant to C.R.C.P. 23, which would have allowed the Investors to prosecute its proposed class action lawsuit. Subsequently, a different district court judge[1] ruled that the Investors could not obtain through discovery the names of the campaign donors.

## II.

We first address Calvary Temple's assertion that the district court's orders concerning certification of a class and discovery are not properly reviewed in an original proceeding.

## A.

■ We ordinarily will not review in an original proceeding a trial court's order denying a motion to certify a class since trial courts have broad discretion over such matters. *See Goebel v. Colorado Dep't of Insts.*, 764 P.2d 785, 794 (Colo.1988). However, we have not limited the reach of our original jurisdiction by reference to particu-

lar subject areas of the law. The common denominator of cases we have reviewed on original jurisdiction is concern that a lower court has exceeded its jurisdiction, or the court has abused its discretion and an appellate remedy would not be adequate. *See, e.g., Halliburton v. County Court of Denver*, 672 P.2d 1006, 1009 (Colo.1983). Accordingly, we have exercised original jurisdiction even on issues concerning class actions. *See Mountain States Tel. and Tel. v. District Court of Denver*, 778 P.2d 667 (Colo.), *cert. denied*, —— U.S. ——, 110 S.Ct. 519, 107 L.Ed.2d 520 (1989).

■ Because of this case's unique facts, we conduct a limited review of the trial court's ruling denying certification of the Investors' proposed class. We begin by noting that the record supplied to this court is too incomplete for this court to affirm or overrule the trial court's order. We also note that the Investors' proposed class action, apparently like their individual lawsuit, claims that the Second Mile fund was an express trust with Calvary Temple as the trustee, that Calvary Temple breached its fiduciary duty, and that Calvary Temple committed fraud and theft by appropriating monies from the fund.

The Investors' proposed class comprised "natural persons" who had invested in Life Center or the Foundation[2] before each filed for bankruptcy, who had not recovered the principal on their investment in either corporation, and who "have indicated an economic, emotional or spiritual distress, and expressed a desire to recover all or part of such investments." The trial court ruled that the Investors' proposed class did not comply with C.R.C.P. 23.[3]

---

**1.** Judge James C. Flanigan presided over the case following Judge Leslie M. Lawson's November 30, 1989, resignation from the bench.

**2.** The Investors in this original proceeding state that they had sought to certify a class of "natural persons who had lost money investing in Life Center or the Blair Foundation, and who had not forgiven all of their claims." The record, however, is unclear on whether the Investors at trial sought to include or exclude investors and creditors of the Foundation. While the Investors' petition to certify a class included Foundation investors and creditors,

the Investors' supplemental brief in support of their motion for class certification stated that the Investors "would amend their designation of the proposed class to include only 'distressed investors' of Life Center, Inc., leaving to the court the question of whether another counsel ought to represent the creditors of the Foundation under a separate designation."

**3.** C.R.C.P. 23 provides in relevant part:
 (a) **Prerequisites to Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if: (1) The class is so numerous that joinder

First, the court found that the Investors, the proposed class representatives, had not proven that their claims were typical of the claims of the proposed class because, "[f]or example, the non-individual creditors of the Foundation would not be represented by [the Investors'] counsel"; second, the court found that the Investors had not demonstrated that they, as the proposed class representatives, would protect the interests of the rest of the class; finally, the court concluded that the Investors' proposed class would preclude or impede the ability of others not members of the proposed class to protect their interests, contrary to C.R.C.P. 23(b)(1)(B).

The trial court's ruling not to certify the proposed class appears to rely exclusively on an assumption or finding of fact that corporations and other non-individual entities invested money in Life Center and the Foundation, and that these nonindividual entities should be included in a class action filed under the Investors' theories of liability. The Investors' claims for relief, however, are based on the theory that the Second Mile project constituted a trust for the benefit of only those *natural persons* who had lost money investing in Life Center and the Foundation. The critical questions, therefore, include whether entities other than natural persons invested in Life Center or the Foundation and, if so, whether they were included among the intended beneficiaries of the Second Mile project. The parties do not agree on these subjects, and the record does not reveal that the court made findings of fact regarding them.

Because of the status of this record, we do not decide whether the trial court erred in declining to certify the proposed class. However, we make absolute our rule to

show cause on this issue to permit the court, if requested, to determine if a class action can be maintained under the provisions of C.R.C.P. 23.

### B.

■■■ Pretrial discovery orders are interlocutory and not normally considered in original jurisdiction proceedings. *Bond v. District Court of Denver*, 682 P.2d 33, 36 (Colo.1984). However, we have not hesitated to exercise original jurisdiction where such orders place a party at an unwarranted disadvantage in litigating the merits of its claim. *E.g., Caldwell v. District Court of Denver*, 644 P.2d 26, 30 (Colo.1982); *Hawkins v. District Court*, 638 P.2d 1372, 1375 (Colo.1982). In *Caldwell*, the plaintiffs initiated a lawsuit alleging fraud, misrepresentation, and civil conspiracy. On the plaintiffs' motion to compel discovery of documents held by the defendants, the trial court denied the motion, ruling that the documents were privileged. Similarly in *Hawkins* the plaintiffs sought to compel discovery, and the trial court denied the motion on the grounds that the information sought to be discovered was privileged and not discoverable. In both cases, we accepted original jurisdiction because of our conclusion that the trial court's rulings precluded the plaintiffs from "obtaining information vital" to their claims for relief. *Hawkins*, 638 P.2d at 1375.

■■■ In this case, without the donors' names the Investors will be impeded in proving at least one of their allegations— that Calvary Temple fraudulently and in breach of trust transferred from the Second Mile campaign fund monies that donors had specifically donated to the fund to relieve distressed creditors. We thus con-

of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Class Actions Maintainable.** Any action may be maintained as a class action if the prerequisites of section (a) are satisfied, and in addition:

(1) The prosecution of separate actions by or against individual members of the class would create a risk of:

. . . .

(B) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interest[.]

clude that the trial court's ruling denying the Investors access to the names of donors significantly reduced the Investors' ability to prosecute their lawsuit, and that this impediment to the Investors' lawsuit warrants our exercise of original jurisdiction.

### III.

The trial court ruled that the Investors were not entitled to the names of donors because the "names and addresses of donors is not relevant based on the Plaintiffs' Complaint and various amendments thereto, would not lead to the discovery of admissible evidence and is an invasion of privacy contrary to the U.S. Constitution and the Colorado Constitution." We hold that the trial court erred in ruling that the donors' names and addresses are not relevant and would not lead to discovery of admissible evidence. We also hold that neither the district court nor Calvary Temple has identified any provisions in the United States and Colorado constitutions that would exempt from civil discovery the names and addresses of the donors.

### A.

 We first consider whether the donors' names were within the scope of discovery as defined by C.R.C.P. 26(b). C.R.C.P. 26(b)(1) provides that parties may obtain discovery regarding any non-privileged matter that is relevant to the subject matter of a pending action. Included among such discoverable items are the identity and location of persons having knowledge of any discoverable matter. *Id.* Even information not admissible at trial may be discoverable if the information "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* We have construed the discovery rules liberally to effectuate "their purpose of adequately informing the litigants of the facts giving rise to a claim or defense." *Hadley v. Moffat County School Dist. RE–1*, 681 P.2d 938, 945 (Colo.1984). " '[I]n close cases, the balance must be struck in favor of allowing discovery.' " *Hawkins v. District Court*, 638 P.2d 1372, 1375 (Colo.1982)

(quoting *Cameron v. District Court*, 193 Colo. 286, 290, 565 P.2d 925, 928 (1977)). We will uphold a trial court's pretrial discovery orders unless the trial court has abused its discretion. *See LeGrange v. District Court*, 657 P.2d 454, 455 (Colo. 1983).

Although the record does not contain the Investors' complaint, Calvary Temple acknowledges in its brief that the Investors' complaint alleges that Calvary Temple:

> 2. [Made] payments to certain persons and entities ... in violation of ... [a] trust and a breach of ... fiduciary duties owed by Calvary Temple....
>
> 3. [M]ade payments to persons or entities in willful or negligent violation of fiduciary obligations to [the Investors].
>
> 4. [W]ilfully, intentionally and fraudulently disregarded the representations of the ... trust instrument.
>
> 5. [C]ommitted theft of $600,000.00.

These allegations necessarily create factual issues of whether Calvary Temple's advertisements and statements concerning Second Mile Campaign created a trust to which Calvary Temple owed a fiduciary duty and whether Calvary Temple wrongfully transferred monies from the Second Mile campaign fund.

As we noted in part II. of this opinion, the Investors' allegation that Calvary Temple fraudulently and in breach of trust withdrew monies from the fund warrants discovery of the donors' names and addresses. This information appears reasonably calculated to lead to the discovery of admissible evidence—presumably, the testimony of donors who donated money to the fund to relieve distressed creditors but whose donations were used for other purposes. *Cf. Hawkins*, 638 P.2d at 1379 (investigative reports and witnesses' statements compiled by insurance adjuster acting under insurance company's direction were, if not "essential" to plaintiff's claim against the company, at least "reasonably calculated to lead to the discovery of admissible evidence"); *Kerwin v. District Court*, 649 P.2d 1086, 1087, 1088 (Colo.1982) (plaintiff's business ledgers discoverable where

defendant disputed allegation in plaintiff's complaint that he owed plaintiff $774,000).

Thus, we conclude that the Investors' requested discovery was both relevant and reasonably calculated to lead to the discovery of admissible evidence.

### B.

■ We next address Calvary Temple's assertion, and the district court's conclusion, that the United States and Colorado constitutions prohibit discovery of the donors' names and addresses. While the district court did not state which constitutional provisions are implicated by coerced disclosure of the donors' names and addresses, Calvary Temple asserts that such a discovery order would violate the donors' rights of privacy and association.[4] We find no merit in this contention.

"It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas" is protected by the United States Constitution. *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). "[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute" an unconstitutional restraint on the freedom of association, and privacy in group association in many circumstances is indispensable to the preservation of freedom of association. *Id.* at 462, 78 S.Ct. at 1171. We have declined to construe the Colorado Constitution as providing greater protection of fundamental freedoms of association than does the federal Constitution. *MacGuire v. Houston*, 717 P.2d 948, 954–55 (Colo.1986).

The United States Supreme Court has held that the Constitution affords protection to "freedom of association" in two senses—freedom of intimate association, which includes certain intimate human relationships that are basic to individual freedom, and freedom of expressive association, which concerns relationships brought together by the desire to engage in First Amendment-protected activities. *Roberts*, 468 U.S. at 617–18, 104 S.Ct. at 3249–50. Intimate associations are highly personal relationships that are characterized generally by their "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* at 618, 619–20, 104 S.Ct. at 3249, 3250–51.

In this case, we do not find an "intimate association" conferring upon Calvary Temple constitutional exemption from civil discovery. Calvary Temple's identified "association"—Calvary Temple and individuals who have donated money to Calvary Temple—lacks the characteristics of those kinds of intimate relationships that have been afforded greater constitutional protection. The "association" was not formed to further an intimate or secluded relationship but to reimburse Calvary Temple creditors. It has no prerequisites for membership other than a willingness to donate money. It imposes no quantitative limit on its membership. The "affiliation" among its members is tenuous at best. Moreover, the members evidently have never sought seclusion from others. On the whole, the "association," which was formed apparently with the single purpose of paying off Calvary Temple creditors, resembles more a "large business enterprise" than what courts have recognized as a constitutionally protected association. *See Roberts*, 468 U.S. at 620, 104 S.Ct. at 3250; *cf. Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 546–47, 107 S.Ct. 1940, 1946–47, 95 L.Ed.2d 474 (1987) (relationship among Rotary Club members is not the kind of intimate or private relationship warranting constitutional protection because, *inter. alia*, local Rotary clubs range in size from 20 to 900, there is no upper limit, Rotary's purpose is to produce inclusive and not exclusive membership, and many Rotary activities are open to

---

**4.** We construe Calvary Temple's right-to-privacy argument as a component of its right-to-association argument. *See Roberts v. United States Jaycees*, 468 U.S. 609, 618–22, 104 S.Ct. 3244, 3249–52, 82 L.Ed.2d 462 (1984); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958); 3 R. Rotunda, J. Nowak & J. Young, *Treatise on Constitutional Law: Substance and Procedure* § 20.41 (1986).

visitors and strangers); *Roberts,* 468 U.S. at 621, 104 S.Ct. at 3251 (Jaycees' size and unselective recruitment and acceptance of new members are among the features that place it outside the category of relationships that merit the kind of constitutional protection afforded "intimate associations").

Similarly, we do not find persuasive Calvary Temple's assertion that disclosure of the donors' names would interfere with their right to freedom of expressive association. To the extent that the donors may be said to be exercising their freedom of expressive association by donating money to Calvary Temple creditors, this tenuous expressive act cannot prevent the disclosure of their names when faced with the Investors' need for discovery to prosecute their lawsuit. *See id.* at 623, 104 S.Ct. at 3252. We can discern no harm that would befall the donors if their names are revealed, and Calvary Temple has made no showing that any harm would result. *Cf. NAACP,* 357 U.S. at 462, 78 S.Ct. at 1171 (compelled disclosure of NAACP membership would likely adversely affect members' collective effort to foster beliefs they advocate by dissuading others from joining the association because of fear of exposure of their beliefs shown through their associations and the consequences of this exposure). Moreover, we note that the record indicates that Calvary Temple announced its intention at some point to publicly reveal in gratitude the names of all the donors, and it has on occasions prior to this lawsuit identified numerous donors. These facts demonstrate that neither the donors nor Calvary Temple had any expectations of privacy concerning the donors' names.

The first amendment and article II, section 10, of the Colorado Constitution do not prohibit the district court from ordering Calvary Temple to disclose to the Investors the names of Second Mile Campaign donors.

## IV.

We conclude that the trial court abused its discretion in denying the Investors' request for discovery of the donors' names and addresses. We make absolute the rule to show cause.