(856 P.2d 515)

No. 69,029

KANSAS HUMAN RIGHTS COMMISSION, *Appellant*, v. TOPEKA GOLF ASSOCIATION, *Appellee*.

Opinion filed July 16, 1993.

*Judy Fowler*, of Kansas Human Rights Commission, of Wichita, for the appellant.

*William E. Enright*, of Scott, Quinlan & Hecht, of Topeka, for the appellee.

Before BRISCOE, C.J., LEWIS and PIERRON, JJ.

LEWIS, J.: This is an appeal by the Kansas Human Rights Commission (KHRC) from adverse rulings by the district court.

This review is the culmination of an action began by Kelly Muxlow against the Topeka Golf Association (TGA), a/k/a Topeka Men's Golf Association. In 1988 and 1989, Muxlow filed a total of four complaints against the TGA before the KHRC. These complaints alleged that the TGA had unlawfully discriminated against Muxlow by refusing her membership and the right to play in their golf tournaments because of her sex. The TGA responded to the complaints filed by Muxlow by asserting that the KHRC had no jurisdiction over the TGA.

After the hearing was concluded, the KHRC found that it did have jurisdiction over the TGA. It also found that the TGA had violated the provisions of K.S.A. 44-1009 by unlawfully discriminating against Muxlow because she was a female. The KHRC assessed a $6,000 fine against the TGA for its unlawful discriminatory practices. The TGA did not seek judicial review of this decision.

The KHRC has no power to enforce payment of the fines and penalties assessed. The TGA refused to pay the fine levied.

The present action was instituted by the KHRC in the district court, seeking to enforce its order assessing $6,000 in fines and penalties against the TGA. The district court refused to enforce the order, finding that the KHRC had no jurisdiction over the TGA. The KHRC appeals the district court's decision that it had no jurisdiction over the TGA. We affirm the decision of the district court.

Muxlow is a resident of Topeka and is a golfer of some repute. Muxlow cannot simply be designated as a good "female golfer." She is a good golfer and capable of competing successfully with both men and women. Indeed, Muxlow played in a TGA tournament in 1987. She and her husband played in the city "two-man" tournament as a team, won the first flight, and received a

plaque and a gift certificate. Muxlow also worked for a period of time as an assistant golf pro at a Topeka public golf course and, for some period of time, was considered to be a professional golfer. The record shows that her amateur status was later officially restored.

The TGA was organized for the purpose of promoting golf within the City of Topeka. Its purpose is to promote "good fellowship" among the various clubs, their members, and other golfers of the city. The TGA is a nonprofit corporation and was granted nonprofit status by the IRS in 1964; it has maintained that status to the present date. Although not specified in the record, we assume that its nonprofit status was obtained and is maintained under § 501(c)(7) (1988) of the Internal Revenue Code. That section provides for exempt, nonprofit status for "[c]lubs organized for pleasure, recreation, and other nonprofitable purposes, substantially all of the activities of which are for such purposes and no part of the net earnings of which inures to the benefit of any private shareholder."

There is apparently no question that the TGA qualifies under the definition cited above. The district court found that "[n]o officer or member of the Topeka Men's Golf Association profited in any way from the operation of the Association." The KHRC does not appeal from that factual finding.

During the relevant times disclosed by the record, the TGA did not: (a) own a golf course; (b) own any kind of public facilities; (c) own, operate, lease, or manage a public facility of any kind; or (d) act as an agent or employee for any place of public accommodations.

The sole function of the TGA was to arrange for and conduct golf tournaments for its members on various golf courses within the City of Topeka. Membership in the TGA was obtained by filling out a membership card/application and by sending the application along with a $3.00 fee to the TGA. Muxlow became a member of the TGA in 1987 by following this procedure.

Although the Topeka Golf Association occasionally refers to itself as the Topeka Men's Golf Association, we shall refer to it in this opinion as the TGA. The problem relevant to this opinion developed in November 1987 when section five of the bylaws of the TGA was amended to read as follows: "With the exception

of the Junior Tournaments and the Bill Mohr Memorial Tournament, TGA Tournaments are *men's events*." (Emphasis added.)

Despite the fact that Muxlow had been a member in 1987, she was denied membership in the TGA in 1988 and 1989. During 1988 and 1989, Muxlow was advised in four separate incidents that, because she was female, she would not be allowed to play in TGA tournaments. These four incidents form the basis of the complaints Muxlow filed before the KHRC.

There is only one basic issue on this appeal: Did the KHRC have jurisdiction over the TGA in the proceedings in which the $6,000 in fines and penalties were levied? This issue can be separated into two basic questions: (1) Did the KHRC have the authority to enact K.A.R. 21-46-2 on which it based its finding that it had jurisdiction over the TGA? (2) If K.A.R. 21-46-2 is not valid, is the TGA a nonprofit fraternal or social association or corporation as that term is used in K.S.A. 44-1002(h)? In this opinion, we will limit our discussion to the question of whether the TGA is a nonprofit social association or corporation. There is no claim that the TGA is a fraternal association.

The issue before this court is narrowly defined. Our question is whether the KHRC had jurisdiction over the TGA. If it did, its assessment of fines and penalties was valid and the order of the district court should be reversed. If it did not, then its orders were void and the district court must be affirmed.

We emphasize that we are not required to determine whether the TGA discriminated against Muxlow because she was female. The KHRC found that the TGA did discriminate against Muxlow on that basis. That finding was not appealed and is binding upon this court as well as the parties to the action. We take it as an established fact that the TGA did discriminate against Muxlow on the basis of her sex.

Not all discrimination has been made unlawful by our legislature. While arguably discrimination is morally and ethically objectionable, only certain types of discrimination are designated as unlawful. If the KHRC was not given jurisdiction over groups such as the TGA, then such groups may, by legislative fiat, discriminate without interference by the KHRC. Such a conclusion is not an endorsement of discriminatory action by this court. It is a simple recognition that the legislature has not seen fit to

allow the KHRC to punish a particular organization for an act of discrimination. The legislature has provided that nonprofit social associations or corporations are not subject to the Kansas Act Against Discrimination, with some very narrowly defined exceptions.

There are multiple state and federal agencies whose job is to seek out and punish acts of discrimination deemed unlawful by our legislative bodies. These various agencies have certain defined areas of jurisdiction. Actions by an administrative body taken against organizations over which they do not have jurisdiction are void. This fact does not grant legitimacy to the discriminatory action. It merely recognizes that the law has not given the agency in question the authority to punish the acts of discrimination by that particular organization.

We note that the KHRC has suggested that if it has no power to punish discrimination by the TGA, then that organization is free to discriminate, not only on the basis of sex but on the basis of race, creed, color, or national origin. While it may be true that the KHRC has no power to punish the TGA for discriminatory acts, our decision goes no further than that. The acts of discrimination by the TGA are not legitimized by the fact that the KHRC has no jurisdiction over the TGA.

As an example, we note that an organization such as the TGA would lose its I.R.C. § 501(c)(7) exemption should it discriminate against any person on the basis of race, color, or religion. IR Manual 7(10)G-40, 3/30/79. Thus, we doubt that a decision affirming the district court would lead the TGA to assume that it could then discriminate on the base of race, color, or religion. If it did so, it would lose its nonprofit status because, under those circumstances, the Internal Revenue Service would have jurisdiction to punish those particular acts of discrimination. We do note, however, that Congress has not seen fit at this point to provide forfeiture of nonprofit status because an organization discriminated on the basis of the sex of the complaining party.

Our decision is based upon the power which was given by the legislature to KHRC to punish certain organizations for acts of discrimination. It should not be read to stand for anything other than that.

## VALIDITY OF K.A.R. 21-46-2

The KHRC based its action against the TGA on a violation of K.S.A. 44-1009(c)(1) and (2), which provide:

"(c) It shall be an unlawful discriminatory practice:

"(1) For any person, as defined herein being the owner, operator, lessee, manager, agent or employee of any place of *public accommodation* to refuse, deny, or make a distinction, directly or indirectly, in offering its goods, services, facilities, and accommodations to any person as covered by this act because of race, religion, color, sex, physical handicap, national origin or ancestry, except where a distinction because of sex is necessary because of the intrinsic nature of such accommodation.

"(2) For any person whether or not specifically enjoined from discriminating under any provisions of this act, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." (Emphasis added.)

Muxlow was forbidden membership in the TGA because of her sex. This is clearly a discriminatory practice on the part of the TGA. The question is whether the KHRC has any authority to punish the TGA for that discriminatory act.

As noted, the legislature has forbidden certain discriminatory actions by the owner, manager, employee, etc. of a place of "public accommodation." The term "public accommodation" is a term of art. K.S.A. 44-1002(h) defines "public accommodations" as: "any person as defined herein who caters or offers goods, services, facilities, and accommodations to the public but shall *not include a nonprofit fraternal or social association or corporation.*" (Emphasis added.)

By statute, the term "public accommodation" does not include a social association or corporation. If the TGA is such an association or corporation, then it is not a public accommodation and it is not subject to the Kansas Act Against Discrimination (KAAD), K.S.A. 44-1001 *et seq.*

The TGA argues that it is a nonprofit social association or corporation and not a "public accommodation" as defined in the statute.

The KHRC concluded that it had jurisdiction over the TGA on the basis of K.A.R. 21-46-2. This regulation, which was enacted by the KHRC, reads as follows:

"An association or corporation shall be deemed exempt from coverage by the Kansas act against discrimination as a nonprofit fraternal or social as-

sociation or corporation *only* if it meets all the following requirements: (a) *Requirements*. (1) It is organized in good faith for social or fraternal purposes;

(2) Membership entails the payment of bona fide initiation fees or regular dues;

"(3) There exists a regularly established means of self-government by the members thereof clearly set forth in a constitution or by-laws adopted by the membership.

"(4) There is a regularly established means and criteria for admitting members and for expulsion of members by the existing membership or by their duly elected or appointed delegates.

"(5) It is not operated, directly or indirectly, for purposes of profit for any individual or groups of individuals other than the membership as a whole."

It is apparent that K.A.R. 21-46-2 is an attempt to limit and define the type of nonprofit social association or corporation which can be regulated under the Act.

The KHRC held that the TGA was not a social association or corporation as that term is defined by K.A.R. 21-46-2. Specifically, the KHRC concluded that the TGA did not meet the requirements of K.A.R. 21-46-2(1) and (4). The Commission concluded that the TGA did meet the requirements of K.A.R. 21-46-2(2), (3), and (5). However, the regulation requires that, in order to be exempt from coverage, an organization must meet *all* of the requirements of K.A.R. 21-46-2. The key to the assumption of jurisdiction over the TGA is the validity of K.A.R. 21-46-2.

The district court declared that the KHRC had exceeded its authority in adopting K.A.R. 21-46-2, on which it based its jurisdiction over the TGA. It declared the regulation to be void and held that no jurisdiction could be assumed by the KHRC on the basis of that regulation. We agree with the decision of the district court.

The district court's ruling that K.A.R. 21-46-2 was void is a question of law. This court's review of that decision is, therefore, unlimited. *Hutchinson Nat'l Bank & Tr. Co. v. Brown*, 12 Kan. App. 2d 673, 674, 753 P.2d 1299, *rev. denied* 243 Kan. 778 (1988).

K.S.A. 44-1004(3) specifically gives the KHRC the power and duty "[t]o adopt, promulgate, amend and rescind suitable rules and regulations to carry out the provisions of [the KAAD], and

the policies and practices of the commission in connection therewith." Kansas Administrative Regulations, if valid, have the force of law. K.S.A. 77-425; *Kansas Gas & Electric Co. v. Kansas Comm'n on Civil Rights*, 242 Kan. 763, 765, 750 P.2d 1055 (1988).

The Supreme Court has clearly defined the limits to which an agency may adopt regulations under the statute quoted above:

"Pursuant to K.S.A. 44-1004(3), the KCCR has the authority to 'adopt, promulgate, amend and rescind suitable rules and regulations to carry out the provisions of the [Act].' *However, this authority is administrative, not legislative, and to be valid must be within the authority conferred by statute. A rule or regulation which goes beyond that which the legislature has authorized, or which violates the statute, or which alters, extends, or limits the source of its legislative powers is void. Woods v. Midwest Conveyor Co.*, 231 Kan. 763, 771, 648 P.2d 234 (1982)." (Emphasis added.) *Kansas Comm'n on Civil Rights v. U.S.D. No. 501*, 243 Kan. 137, 144, 755 P.2d 539 (1988)

See *Rhodes v. Harder*, 211 Kan. 820, 508 P.2d 959, *aff'd as modified* 212 Kan. 500, 512 P.2d 354 (1973); *Willcott v. Murphy*, 204 Kan. 640, 465 P.2d 959 (1970).

In *Willcott v. Murphy*, the Supreme Court declared that "[t]he power to regulate, though declared to be broad, nevertheless, falls short of the power to legislate." 204 Kan. at 648. In *State, ex rel., v. Columbia Pictures Corporation*, 197 Kan. 448, 455, 417 P.2d 255 (1966), the following is stated: "The authority to declare the public policy of this state is vested in the legislature, not an administrative board."

In *Kansas Comm'n on Civil Rights v. U.S.D. No. 501*, 243 Kan. 137, the Kansas Commission on Civil Rights (KCCR), the predecessor of the KHRC, attempted to declare by regulation that public schools were "places of public accommodation." The Supreme Court struck down the regulation as an unlawful attempt by the KCCR to broaden its authority:

"By enacting K.A.R. 21-46-3, the KCCR exceeded the scope of the Act, broadening its authority beyond the three areas of housing, employment, and public accommodations to student admission to schools. *This is not regulation, but legislation*; and we have long held that legislation may not be enacted under the guise of regulation. [Citation omitted.]" (Emphasis added.) 243 Kan. at 144.

In *Woods v. Midwest Conveyor Co.*, 231 Kan. 763, 648 P.2d 234 (1982), the KCCR had adopted a regulation which allowed it to award punitive damages. This regulation was declared void

by the Supreme Court as exceeding the statutory authority of the KCCR.

"However, the Commission cannot pull itself up by its own boot straps. The power to adopt rules and regulations is administrative in nature, not legislative, and to be valid must be within the authority conferred. An administrative rule or regulation which goes beyond that which the legislature has authorized, or which violates the statute, or which alters, extends, or limits the source of its legislative powers is void. [Citations omitted.]" 231 Kan. at 771.

In the case presently before this court, K.S.A. 44-1002(h) exempted from the term "public accommodations" "a nonprofit fraternal or social association or corporation." The legislature did not see fit to limit or further define the term "nonprofit fraternal or social association or corporation." K.A.R. 21-46-2 is an attempt to subject certain nonprofit social associations or corporations to the terms of the act against discrimination. The legislature has exempted all such organizations. The only requirement is that the organization be nonprofit and social in nature. The regulation is an attempt to broaden the authority of the KHRC over social associations and corporations which have been declared exempt by the legislature. This is an attempt to exercise legislative power and to declare the public policy of the state. The KHRC has no authority to act in this fashion, and K.A.R. 21-46-2 is void.

The legislative history of the Kansas Act Against Discrimination indicates an intent by the legislature not to define or limit the type of nonprofit social association or corporation which is exempted from the Act.

The term "nonprofit social association or corporation" was first employed by the legislature in 1961 when 44-1002(b) was amended to define "employer" as "any person in this state employing eight (8) or more persons." L. 1961, ch. 248, § 2. The statute, however, went on to provide that the term employer *shall not include a nonprofit religious, charitable, fraternal, social, educational, or sectarian association or corporation.* L. 1961, ch. 248, § 2. This same terminology has been employed over the past 32 years, during which time the legislature has only once attempted to define what nonprofit social organizations are subject to the provisions of the act.

In 1963, the legislature added 44-1002(h), which originally read as follows:

"The words 'hotel,' 'motel' and 'restaurant' shall each have the meanings ascribed to them respectively by sections 36-101 and 36-301 . . . *but shall not include a nonprofit religious, fraternal, or sectarian association or corporation*." (Emphasis added.) L. 1963, ch. 279, § 2.

In 1965, subsection (h) of 44-1002 was again amended to read:

"[T]he term 'public accommodations' shall include any person, as defined herein, who caters or offers his goods, facilities, and accommodations to the public, *but shall not include a nonprofit fraternal or social association or corporation*." (Emphasis added.) L. 1965, ch. 323, § 2.

In the 28 years since 1965, 44-1002(h) has used the terms "nonprofit fraternal or social association or corporation." In those 28 years, the legislature has only seen fit to further define or limit the application of those terms on one occasion.

In 1974, the legislature added the term "physical handicap" to the list of unlawful discriminatory practices. It also specifically defined and limited the term "physical handicap" by amending 44-1002 and adding subsection (j). Despite this specific and limiting definition of the term "physical handicap," the legislature made no effort to define or limit the term "nonprofit fraternal or social association or corporation." L. 1974, ch. 209, § 2.

In 1991, after the facts in this case gave rise to the cause of action, the legislature amended K.S.A. 44-1002(i) by adding the following:

"(i) 'Unlawful discriminatory practice' means: (1) Any discrimination against persons by reason of their race, religion, color, sex, disability, national origin, or ancestry; . . .

. . . .

"(2) *any discrimination against persons in regard to membership in a nonprofit recreational or social association or corporation by reason of race, religion, sex, color, disability, national origin or ancestry if such association or corporation has 100 or more members and: (A) Provides regular meal service; and (B) receives payment for dues, fees, use of space, use of facility, services, meals or beverages, directly or indirectly, from or on behalf of nonmembers*." (Emphasis added.) L. 1991, ch. 147, § 2.

This amendment in 1991 demonstrates that the legislature has reserved unto itself the right to limit or define the type of nonprofit social association or corporation to which the Act applies. The legislature, in fact, did so in 1991 and did so very narrowly.

The TGA does not now and did not at the time of the incidents in question provide regular meal service or receive payments from nonmembers. Thus, the TGA is not subject to the terms of the Act even under the 1991 amendments. This is a clear indication that the attempt of the KHRC to exercise jurisdiction over certain nonprofit corporations by regulation was clearly void.

The legislature has reserved unto itself the power to define or limit the term "nonprofit fraternal or social association or corporation." That power has not been delegated to the KHRC. The regulation passed by the KHRC and declared void herein was an attempt to usurp legislative functions and, as such, is invalid.

We have examined minutes of legislative committee meetings compiled over the years concerning the act against discrimination. These minutes show that in 1991, both the American Civil Liberties Union and the Jewish Community Relations Bureau sought to remove from 44-1002(h) the clause: "Public accommodations do not include a nonprofit fraternal or social association or corporation." Despite their efforts, the legislature steadfastly refused to remove or to limit by definition the terms in question. As pointed out, the legislature did subject a very narrowly defined and limited nonprofit social association or corporation to the Act in K.S.A. 1992 Supp. 44-1002(i)(2) as quoted above. This is additional evidence of the fact that the legislature has retained the sole and exclusive right to define specifically the type of nonprofit organization it wishes to place under the act against discrimination. It did not grant that authority to the KHRC.

## IS THE TGA A NONPROFIT SOCIAL ASSOCIATION OR CORPORATION?

We have stricken K.A.R. 21-46-2 as void. The KHRC's jurisdiction over the TGA cannot be based on that regulation. The final question is whether the TGA is a nonprofit social association or corporation within the meaning of K.S.A. 44-1002(h). We deem the answer to that question to be nearly self-evident.

There is no question that the TGA is a nonprofit corporation organized for pleasure and other recreation which is exempt from taxation under § 501(c)(7). Its sole purpose is to sponsor and regulate golf tournaments. It is an organization which members join for the sole purpose of playing in various golf tournaments.

We believe that the TGA is the very essence of a social association or corporation.

We find no specific definition of these terms in the Kansas Reports. Black's Law Dictionary 1561 (4th Ed. Rev. 1968) defines "social clubs" as follows: "Within federal statutes imposing tax on dues and initiation fees of such clubs, clubs whose social features are a material part of their activities and necessary to their existence, and not merely incidental."

In *Lake of the Forest Club v. United States*, 137 F.2d 843, 845 (10th Cir. 1943), the term "social club" was discussed:

"It is not necessary that the dominant or major portion of a club's activities be devoted to social or athletic functions to make it a social or athletic club within the meaning of the taxing statute. If the social or athletic features of the club are a material part of its purpose and activities and promote its existence and advancement, it is a social club within the meaning of the Act."

The record in this case shows that the social and athletic features of the TGA are a material part of its purpose and promote its existence and advancement. The TGA is certainly a social association or corporation as that term is defined above.

A golf club whose members associated together for the common purpose of playing golf has been held to be a social club. *Bunker Hill Country Club v. United States*, 9 F. Supp. 52, 56 (1934). A yacht club which leased space from the state and rented slips to its members is a "social, athletic or sporting club." *Hawaii Yacht Club v. United States*, 301 F. Supp. 1150, 1152 (1969). A nonprofit bowling club that conducted regular tournaments for its members qualified for an exemption as a § 501(c)(7) social club where its overall purpose was designed to effect a "commingling of its members for their pleasure and recreation." Rev. Rul. 65-63, 1965-1 C.B. 240.

There is no need to extend this discussion. There are certain terms and functions which are known to all of us by our common understanding. An organization formed to promote golf and supervise golf tournaments for the pleasure and fellowship of its members is engaging in what most of us would clearly recognize to be a social function. We hold that the TGA is clearly a social association or corporation within the meaning of K.S.A. 44-1002(h). The KHRC has no jurisdiction over such a social asso-

ciation or corporation and, thus, had no authority to subject it to any fines or penalties.

We have examined the record to determine whether it can be said that the TGA is engaged in an endeavor of such a nature that Muxlow may have been deprived of a competitive business advantage by its refusal to admit her. We find no such evidence in the record. Muxlow did attempt to prove that she was damaged competitively by being barred from TGA events. However, the KHRC found her evidence in this regard to be "entirely spec-ulative" and made no award of loss of income to Muxlow for that reason. We can find nothing in the record on appeal to indicate that the TGA was engaged in anything more than putting on golf tournaments for the enjoyment and pleasure of its members. The record was not developed to show any overriding business ad-vantage in playing golf or in being a member of the TGA. We conclude that there is nothing in the record on which we could conclude that the TGA is anything more than a social association or corporation. We are not unaware of the fact that certain or-ganizations have seen fit to justify their discriminatory practices by claiming to be entirely social in nature. Where the record has shown that the organization in question was, in reality, a "business establishment," the courts have declared that such organizations may not discriminate under the guise of being a "social organi-zation." One example of this is *Bd. of Dirs. of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 95 L. Ed. 2d 474, 107 S. Ct. 1940 (1987). Although this case has no significance to the instant mat-ter, it is an example of an instance in which an organization which deemed itself to be social in nature was found to be in fact a "business establishment." We have examined the record for ev-idence of this nature and find nothing to support a conclusion that the TGA is a "business establishment" or that it is anything other than a social association or corporation.

In the final analysis, the legislature has seen fit to exempt from the Kansas Act Against Discrimination any nonprofit social as-sociation or corporation. It is not our function to determine whether that is a sound policy because the authority to declare the public policy of the State of Kansas is vested in the legislature and not in the courts or administrative bodies of this state. We conclude that the TGA, as a nonprofit social association or cor-

poration, is not subject by statute to the provisions of the KAAD. The KHRC had no authority to exercise jurisdiction over the TGA. We affirm the decision of the district court.

Affirmed.