**BOY SCOUTS OF AMERICA and National Capital Area Council, Boy Scouts of America, Petitioners,**

v.

**DISTRICT OF COLUMBIA COMMISSION ON HUMAN RIGHTS, Respondent.**

**Roland D. Pool and Michael Geller, Intervenors.**

**No. 01–AA–925.**

District of Columbia Court of Appeals.

Argued Sept. 10, 2002.
Decided Nov. 7, 2002.

George A. Davidson, with whom Carla A. Kerr, Dennis S. Klein, and William A. Barrett were on the brief, for petitioners.

Merril Hirsch, with whom David M. Gische, Laura C. Zimmitti, and Donn Cohen were on the brief, for intervenors.

Robert R. Rigsby, Corporation Counsel at the time, Charles L. Reischel, Deputy Corporation Counsel, and Donna M. Murasky, Senior Litigation Counsel, filed a statement in lieu of brief for the respondent.

Nathalie F.P. Gilfoyle, James L. McHugh, and Lindsay Childress–Beatty filed a brief for amicus curiae American Psychological Association.

William D. Temko and Jerome C. Roth filed a brief for amicus curiae Bay Area Lawyers for Individual Freedom.

Eric Grant, John H. Findley, and Harold E. Johnson filed a brief for amicus curiae Pacific Legal Foundation.

John H. Pickering, Daniel H. Squire, Stuart F. Delery, Van W. Ellis, Carol J. Banta, and Devon F. Leppink filed a brief for amicus curiae Parents, Families, and Friends of Lesbians and Gays, Inc.

Paul Mohler, Lawrence J. Zweifach, Susan K. Leach, and Sharon E. Frase filed a brief for amicus curiae Unitarian Universalist Association.

Before FARRELL, REID, and GLICKMAN, Associate Judges.

FARRELL, Associate J.

This petition for review brings before us a decision of the District of Columbia Commission on Human Rights ("the Commission") holding that petitioners, the Boy Scouts of America and the National Capital Area Council ("NCAC") of the Boy Scouts of America (collectively "the Boy Scouts") violated the District of Columbia Human Rights Act of 1977[1] by denying adult membership to intervenors Roland D. Pool and Michael Geller on the basis of their sexual orientation. As relief, the Commission ordered the Boy Scouts, *inter alia*, to reinstate Pool and Geller as full active adult members of the organization. The principal issue before us, and the only one we find it necessary to decide, is whether the Commission erred in conclud-

---

1. D.C.Code §§ 2–1401.01 *et seq.* (2001) ("the Human Rights Act" or "the Act").

ing that application of the statute to bar the Boy Scouts from excluding Pool and Geller from Scout leadership positions does not infringe upon the Boy Scouts' First Amendment freedom of expressive association. We hold that this question is controlled by the Supreme Court's decision in *Boy Scouts of America v. Dale*, 530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000), and that on the basis of *Dale* the Commission's decision and order must be reversed.

## I.

Geller and Pool, who are both gay, were 35 and 31 years old respectively when this litigation began in 1992. Each had compiled admirable records in Scouting in their youth, attaining the rank of Eagle Scout. From 1980 through 1992, Geller was continually registered as an adult leader of Troop 37 in the Baden–Powell Council, Oswego, New York. Pool had also occupied adult leadership positions in the Boy Scouts, including that of Chief Ranger, until approximately 1985 and retained his interest in Scouting thereafter, attending the 1989 National Jamboree.

In February 1992, then an employee of the World Bank in Washington, D.C., Geller read an article in the Washington Post quoting Ron Carroll, an NCAC Scout Executive, to the effect that the Boy Scouts nationwide does not accept gays as adult leaders because they do not make good role models for male youth progressing into adulthood. Geller wrote a letter to Carroll condemning this attitude as steeped in prejudice and misconceptions and dangerous to Scouting and the young minds it seeks to educate. Pointing to the shortage of role models for young people in today's world, he stated that "[a]s an Ivy League graduate, law-abiding taxpayer, a community volunteer, a chair of a gay and lesbian employee association, and a

steadily employed person with a home life shared by a lover of two years," he was an exceptional candidate to be a Boy Scout leader. He urged Carroll and NCAC to reconsider their stand on the issue, stating that "this issue of gay rights is being played out in your microcosm." Geller sent copies of the letter to reporters or columnists at the *Washington Post* and the *Washington Blade.*

On February 27, 1992, the day Carroll received Geller's letter, Geller's membership in the Boy Scouts was deleted from the Boy Scouts' membership database. A letter of March 2 from the Boy Scouts' Northeast Regional Director told him that, "after careful review, we have decided that your registration with the Boy Scouts of America should be denied," and requested that he sever any relations he might have with the Boy Scouts. Geller appealed the decision terminating his registration to higher Boy Scout officials, but was ultimately told that the action of the Regional Review Committee would be upheld. While the appeal was pending, Geller's name was placed in the Boy Scouts' Ineligible Volunteer File as "an admitted gay leader."

Pool similarly had read an article in the *Washington Blade* that cited the *Washington Post* article reflecting the Boy Scouts' opposition to gays occupying leadership roles in Scouting. At the suggestion of Bart Church, a member of the organization Queer Nation, he contacted the American Civil Liberties Union for legal advice and in May 1992 was referred to the law firm that eventually brought this complaint. In June 1992, Pool called the NCAC about obtaining an Assistant Scoutmaster position. A local Scouting official suggested the post of Unit Commissioner, and Pool subsequently submitted an application to be a Unit Commissioner in the Banneker district of the NCAC. The letter

accompanying the application acknowledged that he was gay. The application itself listed his current employment as a computer specialist with the Smithsonian Institution, and stated that he was a member of the Smithsonian Lesbian and Gay Issues Group. As experience in working with youth, he listed his work as a Youth Group Facilitator, then a Youth Group Coordinator, and most recently a member of the Board of Directors of the Sexual Minority Youth Assistance League; and his work as a Youth Services Task Force Member and Peer Counselor at the Whitman–Walker Clinic, a regional gay men's health clinic.

As in the case of Geller, Pool received a letter from the NCAC in July 1992 denying him registration in the Boy Scouts and asking him to sever any relations with the organization. On the same day, his name was added to the Boy Scouts' Ineligible Volunteer File as in the case of Geller. A memorandum to Steven Montgomery, Associate Scout Executive, from S. Michael Bond, District Executive, stated that Geller's application had been rejected "because in his own letter [he] indicated that he is gay." [2]

On October 16, 1992, Geller and Pool each filed complaints with the District of Columbia Department of Human Rights and Minority Business Development (now known as the Office of Human Rights) alleging that the Boy Scouts had engaged in unlawful discriminatory practices by revoking their scout membership because of their sexual orientation. Eventually the combined cases came before the Commission for an evidentiary hearing, after which the Commission made findings of fact and conclusions of law. It concluded that the exclusion of Geller and Pool was

"an unlawful discriminatory practice" within the meaning of the Human Rights Act. As relevant here, D.C.Code § 2–1402.31(a) states that when done "wholly or partly for a discriminatory reason based on the ... sexual orientation ... of any individual," it is "an unlawful discriminatory practice ... [t]o deny ... any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of any place of public accommodations." The Commission determined first, contrary to the Boy Scouts' threshold argument, that it had jurisdiction over the exclusion of Geller because the Boy Scouts' policy of excluding homosexuals "was developed outside the District [but] applied in the District of Columbia" both to District residents generally and to Geller, who "received [the] letter in the District of Columbia, where he is a resident," telling him his adult membership had been revoked. The Commission also rejected the Boy Scouts' argument that Pool lacked standing to bring a claim under the Act because he "had no intention of becoming a Unit Commissioner but rather [stood only] as a plaintiff to challenge the exclusionary policy." The Commission relied on previous authority from this court holding "that 'testers' who challenge discriminatory practices under the Human Rights Act have standing to bring the claim" (citing *Molovinsky v. Fair Employment Council of Greater Washington*, 683 A.2d 142 (D.C.1996)).

The Commission then turned to whether the Boy Scouts constitutes a "place of public accommodation" within the meaning of the Act, as defined by D.C.Code § 2–1401.02(24). The Commission concluded that references in that definition to "establishments dealing with goods or services of

---

**2.** Pool was an instance, the Commission found, of the Boy Scouts' practice of excluding from membership someone who "wr[o]te ... on the application that they were gay or belong to an organization that is known to be gay."

any kind," and to "institutions" and "clubs," encompassed membership organizations such as the Boy Scouts. It further concluded from the Act's legislative history that "the Commission ... has the authority to determine which membership organization is ... a public accommodation using guidelines set out in Supreme Court decisions such as" *Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987), and that under those guidelines the Boy Scouts "is a public accommodation" in view of "the large size of the organization, its purpose[,] and [the] non-selectivity of its membership."

Having thus concluded that the Boy Scouts violated the Act by denying Geller and Pool the "privileges [and] advantages" of adult membership based on their sexual orientation, the Commission considered finally whether application of the Act would violate the Boy Scouts' freedom of expressive association under the First Amendment, *see generally Roberts v. United States Jaycees,* 468 U.S. 609, 622–23, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), particularly in light of *Boy Scouts of America v. Dale, supra,* decided after the hearing in this case. The Commission found no such infringement. First, it said that admitting Geller and Pool as adult leaders "would not significantly affect the Boy Scout[s'] ability to advocate its public or private viewpoint," because the Boy Scouts' exclusionary policy regarding gays appeared in part "to be no more than a private statement of a few BSA executives, a view that is not actual expression the BSA engages in." The Commission dismissed as evidence of the Boy Scouts' viewpoint various position statements the Scouts had issued over the years. These were, in the Com-

mission's view, either "generated for media relations" or "a mere attempt" as part of state litigation in California "to document a policy for which no evidence exists." [3] Furthermore, even if a desire "not to promote 'homosexual conduct'" were part of the "expression" for which the Boy Scouts associates, the Commission concluded that admitting Geller and Pool as leaders would not significantly burden that expression because—unlike the respondent in *Dale*— neither Geller nor Pool was "a gay activist": no evidence suggested that either "would advocate homosexuality as a BSA adult leader" or "would ... send messages about homosexuality or its lifestyle" just by occupying such a position. "Because Mr. Geller and Mr. Pool are not advocating any particular message," the Commission concluded, "their inclusion into an adult leadership position would not infringe upon BSA's core message."

## II.

In *Dale,* the Supreme Court held that "the application of New Jersey's public accommodations law to require that the Boy Scouts accept [the respondent] Dale as an assistant scoutmaster runs afoul of the Scouts' [First Amendment] freedom of expressive association." *Dale,* 530 U.S. at 656, 120 S.Ct. 2446. In this case, the Boy Scouts argues primarily that, assuming the District's law prohibiting discrimination in places of public accommodation applies to it, the case cannot be distinguished from *Dale* on First Amendment grounds. We agree. We therefore assume without deciding that the Human Rights Act was intended to reach a membership organization such as the Boy Scouts as a "place of public accommodation." [4] We first sum-

---

3. The litigation cited was *Curran v. Mount Diablo Council of Boy Scouts of America,* No.

C–365529 (Cal.Super.Ct.). *See* 17 Cal.4th 670, 72 Cal.Rptr.2d 410, 952 P.2d 218 (1998).

4. The issue is a complex one, *see, e.g., United*

marize the analysis and holding of *Dale,* then consider the intervenors' attempts to distinguish it.

### A.

The Supreme Court summed up what it knew about James Dale as follows:

James Dale entered Scouting in 1978 at the age of eight by joining Monmouth Council's Cub Scout Pack 142 [in New Jersey]. Dale became a Boy Scout in 1981 and remained a Scout until he turned 18. By all accounts, Dale was an exemplary Scout. In 1988, he achieved the rank of Eagle Scout, one of Scouting's highest honors.

Dale applied for adult membership in the Boy Scouts in 1989. The Boy Scouts approved his application for the position of assistant scoutmaster of Troop 73. Around the same time, Dale left home to attend Rutgers University. After arriving at Rutgers, Dale first acknowledged to himself and others that he is gay. He quickly became involved with, and eventually became the copresident of, the Rutgers University Lesbian/Gay Alliance. In 1990, Dale attended a seminar addressing the psychological and health needs of lesbian and gay teenagers. A newspaper covering the event interviewed Dale about his advocacy of homosexual teenagers' need for gay role models. In early July 1990, the newspaper published the interview and Dale's photograph over a caption identifying him as the copresident of the Lesbian/Gay Alliance.

*Id.* at 644–45, 120 S.Ct. 2446. The Appendix filed in the Supreme Court contained Dale's admission that he "is one of a group of gay Scouts who have 'become leaders in their community and are open and honest about their sexual orientation.'" *Id.* at 653, 120 S.Ct. 2446 (quoting Appendix at 11).

Apparently learning of the newspaper interview, the Monmouth Council revoked Dale's adult membership. When he requested a reason for the decision, he was informed by letter "that the Boy Scouts 'specifically forbid membership to homosexuals.'" *Id.* at 645, 120 S.Ct. 2446. (quoting Appendix at 137). Dale thereafter sued the Boy Scouts in the New Jersey Superior Court, and eventually the Supreme Court of New Jersey ruled in Dale's favor, concluding that the Boy Scouts had violated the state's public accommodations law "by revoking Dale's membership based on his avowed homosexuality." *Id.* at 646, 120 S.Ct. 2446. The court further rejected the Boy Scouts' claim of infringement on its right of expressive association, because the court "was 'not persuaded ... that a shared goal of Boy Scout members is to associate in order to preserve the view that homosexuality is immoral.'" *Id.* at 647, 120 S.Ct. 2446, quoting *Dale v. Boy Scouts of America,* 160 N.J. 562, 734 A.2d 1196, 1223–24 (1999).

---

*States Jaycees v. Bloomfield,* 434 A.2d 1379, 1381 (D.C.1981) (Jaycees "is beyond the reach of the [Human Rights] Act since it is not a place of public accommodation as defined by the Act"), and may arguably implicate this court's contested case jurisdiction. *See* D.C.Code § 2–509 (2001). But our decisions enable us to pretermit such an issue where alternative grounds clearly dictate the correct resolution of the appeal. *See United States v. Owens,* 788 A.2d 570, 574 n. 3 (D.C. 2002); *Childs v. United States,* 760 A.2d 614, 617 (D.C.2000). For the same reason, we assume without deciding (a) that the Commission properly determined it had territorial jurisdiction over Geller (*i.e.,* that the alleged discrimination respecting him took place partly in the District), and (b) that Pool as a "tester" had standing to challenge the Boy Scouts' rejection of his membership application.

Rejecting this conclusion, the U.S. Supreme Court began by summarizing the right of expressive association as follows:

> [I]mplicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.... Government actions that may unconstitutionally burden this freedom may take many forms, one of which is intrusion into the internal structure or affairs of an association like a regulation that forces the group to accept members it does not desire.... The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints.

*Id.* at 647–48, 120 S.Ct. 2446 (citations and internal quotation marks omitted). The Court therefore posed essentially three questions regarding application of New Jersey's anti-discrimination law to the Boy Scouts: (1) "whether the [Boy Scouts] engages in 'expressive association'," *id.* at 648, 120 S.Ct. 2446; (2) if so, "whether the forced inclusion of Dale as an assistant scoutmaster would significantly affect the Boy Scouts' ability to advocate public or private viewpoints," *id.* at 650, 120 S.Ct. 2446; and (3) if so, "whether the application of New Jersey's public accommodations law to require that the Boy Scouts accept Dale as an assistant scoutmaster runs afoul of the Scouts' freedom of ex-

pressive association." *Id.* at 656, 120 S.Ct. 2446. The Court answered each question affirmatively.

The Court first observed that, according to its statement of mission, the Boy Scouts' general mission is to instill values in young people, a function its scoutmasters and assistant scoutmasters perform expressly and by example during the time they spend with youth members.[5] "It seems indisputable," the Court stated, "that an association that seeks to transmit such a system of values engages in expressive activity." *Id.* at 650, 120 S.Ct. 2446. The Commission in our case took as a given that the Boy Scouts engages in expressive association.

Addressing the second question, the Court explained that "[t]his inquiry necessarily requires us first to explore, to a limited extent, the nature of the Boy Scouts' view of homosexuality." *Id.* at 650, 120 S.Ct. 2446. That exploration turned out to be limited indeed:

> The Boy Scouts asserts that it "teach[es] that homosexual conduct is not morally straight," Brief for Petitioners 39, and that it does "not want to promote homosexual conduct as a legitimate form of behavior," Reply Brief for Petitioners 5. We accept the Boy Scouts' assertion. We need not inquire further to determine the nature of the Boy Scouts' expression with respect to homosexuality.

*Id.* at 651, 120 S.Ct. 2446.[6] The Court went on say, nevertheless, that "because

---

**5.** Those values, the Court pointed out, were embodied in the Scout Oath and Scout Law, which include the duty to be "morally straight" and "clean"—terms the Court observed "are by no means self-defining." 530 U.S. at 650, 120 S.Ct. 2446.

**6.** The Court rejected in this regard the New Jersey Supreme Court's reasoning that the

Boy Scouts' exclusion of members solely on the basis of their sexual orientation " 'appear[ed] antithetical to the organization's goals and philosophy'' which call for " 'diverse and "representative" membership.' " 530 U.S. at 651, 120 S.Ct. 2446, quoting 734 A.2d at 1226. "It is not the role of the courts," the U.S. Supreme Court said, "to reject a group's expressed values because they

the record before us contains written evidence of the Boy Scouts' viewpoint, we look to it as instructive, if only on the question of the sincerity of the professed beliefs." *Id.* The Court quoted three position statements issued by the Boy Scouts between 1978 and 1993 setting forth the "official position of the Boy Scouts ... that avowed homosexuals were not to be Scout leaders," and noted as well the California state litigation[7] "in the early '80's, [in which] the Boy Scouts consistently asserted the same position with respect to homosexuality that it asserts today." *Id.* at 652, 120 S.Ct. 2446. The Court concluded: "We cannot doubt that the Boy Scouts sincerely holds this view." *Id.* at 653, 120 S.Ct. 2446.

The central question, therefore, was "whether Dale's presence as an assistant scoutmaster would significantly burden the Boy Scouts' desire to not 'promote homosexual conduct as a legitimate form of behavior.' Reply Brief for Petitioners 5." *Id.* at 653, 120 S.Ct. 2446. And, the Court explained, "[a]s we give deference to an association's assertions regarding the nature of its expression, we must also give deference to an association's view of what would impair its expression." *Id.* Although "an expressive association can[not] erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message,"

> here Dale, by his own admission, is one of a group of gay Scouts who have "become leaders in their community and are open and honest about their sexual orientation." App. 11. Dale was the co-president of a gay and lesbian organization at college and remains a gay rights activist. Dale's presence in the Boy Scouts would, at the very least, force the

organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior. *Id.*

The Court found "illustrative" on this point its prior decision in *Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston, Inc.* (GLIB), 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), which had held that the application of Massachusetts' public accommodations law to require the organizers of a private St. Patrick's Day parade to include GLIB members among the marchers violated the parade organizers' First Amendment rights. Pointing out that "the parade organizers [in *Hurley*] did not wish to exclude the GLIB members because of their sexual orientations, but because they wanted to march behind a GLIB banner," *id.*, the *Dale* Court concluded:

> Here, we have found that the Boy Scouts believes that homosexual conduct is inconsistent with the values it seeks to instill in its youth members; it will not "promote homosexual conduct as a legitimate form of behavior." Reply Brief for Petitioners 5. As the presence of GLIB in Boston's St. Patrick's Day parade would have interfered with the parade organizers' choice not to propound a particular point of view, the presence of Dale as an assistant scoutmaster would just as surely interfere with the Boy Scouts' choice not to propound a point of view contrary to its beliefs.

*Id.* at 654, 120 S.Ct. 2446.

The answer to the third question posed—whether the application of New Jersey's public accommodations law to require acceptance of Dale as an assistant

---

disagree with those values or find them internally inconsistent." *Id.*

7. This was the *Curran* litigation, see note 3, *supra,* and accompanying text.

scoutmaster violated the Boy Scouts' freedom of expressive association—followed almost inevitably from the foregoing analysis. Explaining that in each of its prior cases on the subject "the associational interest in freedom of expression has been set on one side of the scale, and the State's interest [in eliminating discrimination] on the other," *id.* at 658–59, 120 S.Ct. 2446,[8] the Court stated the outcome of that balancing in *Dale:*

> We have already concluded that a state requirement that the Boy Scouts retain Dale as an assistant scoutmaster would significantly burden the organization's right to oppose or disfavor homosexual conduct. The state interests embodied in New Jersey's public accommodations law do not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association.

*Id.* at 659, 120 S.Ct. 2446.

### B.

The Commission on Human Rights acknowledged the Supreme Courts' determination of "the nature of the Boy Scouts' expression with respect to homosexuality," *id.* at 651, 120 S.Ct. 2446, as well as the Court's reliance—"if only on the question of the sincerity of the professed beliefs," *id.*—on the consistent position statements issued by the Boy Scouts between 1978 and 1993. Nevertheless, the Commission undertook its own "review of the history of the exclusionary policy and the position statements," and concluded that its review "shed a different light" on whether those statements reflected the unified position or expression of the Boy Scouts, rather than merely "a private statement of a few BSA executives." In this court, intervenors defend the Commission's reliance on the record before it of the Boy Scouts' viewpoint concerning sexual orientation by pointing out that *Dale* was decided in the New Jersey courts on cross-motions for summary judgment, in contrast to the full evidentiary hearing that took place here. They argue, for example, that the Boy Scouts' own witnesses testifying at the hearing "reinforced" the testimony of the intervenors' witnesses that neither the Scout Oath nor Scout Law expresses a viewpoint on the morality of homosexual conduct—thus supporting the Commission's finding that the various position statements "are not based on any expressive activity or any moral view [of the Boy Scouts], but rather [on] an exclusionary membership policy."

This argument, and the Commission's conclusion that opposition to homosexuality is not "the Boy Scouts' viewpoint" for First Amendment purposes, cannot be reconciled with *Dale.* The Court there "accept[ed] the Boy Scouts' assertion"—stated in its *brief* to the Supreme Court—"that it does not want to promote homosexual conduct as a legitimate form of behavior," ' *Dale,* 530 U.S. at 651, 120 S.Ct. 2446, adding: "[w]e need not inquire further to determine the nature of the Boy Scouts' expression with respect to homosexuality." *Id.* Although the Court looked further "if only" to test "the sincerity of the professed beliefs," it found sufficient the "written evidence" of position papers issued periodically by the Scouts over the years that mirrored its present position—the same position papers that the Commission here rejected as "generated for media relations" or for the purpose of litigation, and so

---

**8.** Regarding the latter interest, the Court pointed out that "[a]s the definition of 'public accommodation' has expanded from clearly commercial entities, such as restaurants, bars, and hotels, to membership organizations such as the Boy Scouts, the potential for conflict between state public accommodations laws and the First Amendment rights of organizations has increased." 530 U.S. at 657, 120 S.Ct. 2446.

having no evidentiary significance. The Court likewise credited the documentary assertions made by the Boy Scouts in the *Curran* litigation, but which the Commission here dismissed as a "mere attempt to document a policy for which no evidence exists." The Commission was not free to disregard the Supreme Court's analysis in this way. Absent a demonstrated change in the Boy Scouts' "official position"—which was .stated to the Court *after* the record was developed before the Commission—nothing in *Dale* suggests that a different tribunal may consider other evidence and define the Boy Scouts' viewpoint differently based on, for example, equivocal statements of Boy Scout witnesses in testimony before it. Indeed, the Court chastised the New Jersey Supreme Court for having looked behind the Boy Scouts' position statements and found inconsistencies in various expressions of its values: "it is not the role of the courts to reject a group's expressed values because they . . . find them internally inconsistent." *Id.* at 651, 120 S.Ct. 2446. The upshot of the Supreme Court's analysis was that "[t]he Boy Scouts takes an official position with respect to homosexual conduct, and that is sufficient for First Amendment purposes." *Id.* at 655, 120 S.Ct. 2446.

The Commission further attempted to distinguish *Dale* on the ground that admitting Michael Geller and Roland Pool, unlike James Dale, "as adult volunteers would not significantly burden [the Boy Scouts] in its desire not to promote 'homosexual conduct.' " This was because in the Commission's view Geller and Pool are not "activists sending a message like James Dale": there is no evidence that either "would advocate homosexuality as a BSA

adult leader" or would "send messages about homosexuality or its lifestyle" merely by occupying leadership roles. The intervenors urge the same distinction on appeal. Dale, they say (Br. for Intervenors at 26), "was so publicly associated with homosexuality" that in the Supreme Court's view "his mere presence in Scouting would force the Boy Scouts to send a message about it." As an "avowed homosexual and gay rights activist," *Dale*, 530 U.S. at 655–56, 120 S.Ct. 2446, they argue, he was functionally no different than the GLIB members in *Hurley* who "wanted to march behind a GLIB banner." *Id.* at 653, 120 S.Ct. 2446.

Evaluating this argument requires us to attempt to understand what the *Dale* Court meant by the term "gay activist," specifically whether that term had significance for the Court—and how much—beyond the fact that Dale was an "avowed homosexual." The two terms—"avowed homosexual and gay rights activist"—are paired several times in the Court's opinion. *See id.* at 644, 653, 655–56, 120 S.Ct. 2446. By itself, of course, the fact that Dale was an avowed homosexual in that he was " 'open and honest about [his] sexual orientation'," *id.* at 653, 120 S.Ct. 2446, does not distinguish that case from this one, because so are Geller and Pool. Both joined gay and lesbian employee associations as adults, and both openly told the Boy Scouts they were homosexual when they initiated contact with the organization in 1992.[9] But was either a "gay activist" in the sense that Dale was, and does it matter to the analysis?

Answering the latter question first, we have no doubt that the Court meant something of legal significance by coupling

---

9. Indeed, that is why Pool was denied adult membership and Geller was expelled. Geller's name was placed in the Ineligible Volunteer File as "an admitted gay leader," and

Pool's application for a leadership position was rejected "because in his own letter [and application he] indicated that he is gay."

"avowed homosexual" with—or distinguishing it from—"gay activist" in describing Dale. Beyond the repeated pairing of the terms in the opinion is the fact that the Court analogized Dale's presence in Scouting to the unmistakably activist, would-be marchers behind the GLIB banner in *Hurley. Id.* at 653, 120 S.Ct. 2446. Thus, the description of Dale as a gay activist must have some meaning. But it would be equally mistaken, in our view, to read too much into it. Nothing in the Court's opinion suggests that it viewed Dale as one who—in the Commission's words here— "would advocate homosexuality as a [Boy Scout] leader" by using his position as a platform to convey the message that homosexual conduct is legitimate. Although it is not conclusive, the four dissenting Justices in *Dale* were certain that the majority did not believe either (1) that Dale would "use his position as a bully pulpit," *id.* at 692, 120 S.Ct. 2446 (Stevens, J., dissenting), or (2), alternatively, that he "had become so publicly and pervasively identified with a position advocating the moral legitimacy of homosexuality (*as opposed to just being an individual who openly stated he is gay* ) that his leadership position in BSA would necessarily amount to using the organization as a conduit for publicizing his position." *Id.* at 695 n. 21, 120 S.Ct. 2446 (Stevens, J., dissenting) (emphasis added). The Court's opinion does not cast Dale in either such role, any more than does the record before the Commission portray Geller or Pool with similar features.

Probably the best indication of what the Supreme Court meant by "gay activist"— *i.e.*, what measure of "activism" sufficed for the Boy Scouts to conclude that his "presence . . . as an assistant scoutmaster would . . . interfere with [its] choice not to propound a point of view contrary to its beliefs," *id.* at 654, 120 S.Ct. 2446—is simply what the Court knew about James

Dale. He had been copresident of a college Lesbian/Gay Alliance, during which tenure an interview with him about "his advocacy of homosexual teenagers' need for gay role models" had appeared in a newspaper along with his picture; and he had become "one of a group of gay Scouts who have 'become leaders in their community and are open and honest about their sexual orientation.'" *Id.* at 645, 653, 120 S.Ct. 2446 (quoting Appendix at 11). On this modest sum of facts the Court determined that his "presence in the Boy Scouts would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior." *Id.* at 653, 120 S.Ct. 2446. It is fair to say, indeed we think the conclusion is compelled, that the evidence of "activism" that sufficed for the Boy Scouts to exclude Dale—or someone like him—from a leadership post *beyond* the fact that he was open and honest about his sexuality did not, for the Court, entail a rigorous inquiry.

Applying whatever measure of "activism" the Supreme Court fairly can be said to have intended, Geller and Pool cannot meaningfully be distinguished from Dale. In 1992, both men initiated contact with the Boy Scouts in writing to challenge openly a policy of exclusion they believed was offensive to them personally and repugnant to the Boy Scouts' goals. Geller, after reading a newspaper article stating this policy, wrote a letter to Scouting official Ron Carroll condemning it and urging the organization to reconsider it, stating that "this issue of gay rights is being played out in your microcosm." Geller sent copies of the letter to two newspapers of sizeable circulation, "hoping against hope"—as he testified at the hearing—that "this letter might be published." Pool, for his part, applied for a leadership position

with the Boy Scouts after reading an article in *The Washington Blade* stating the policy and reporting that gay activists (specifically members of the group Queer Nation) had been rebuffed on submitting applications for membership at the local Scout office. The article said that Queer Nation's "next move against BSA" would be "recruiting plaintiffs from D.C. and Montgomery and Prince George's County to file human rights complaints against BSA." Pool mentioned the article to a member of Queer Nation who referred him to the American Civil Liberties Union [10] and thence to the law firm that eventually filed this complaint. Pool acknowledged at the hearing that when he applied for a leadership position with the Boy Scouts, he was "contemplating filing a discrimination complaint if [he was] unsuccessful in becoming a leader." [11]

Like Dale, moreover, Geller and Pool have been active in gay and lesbian organizations as adults. Geller told the Boy Scouts that he had been the chair of a gay and lesbian employee association. Pool noted on his application that he had been a member of a similar organization at the Smithsonian Institution, had served as a director and facilitator for the Sexual Minority Youth Assistance League, an organization for gay, lesbian, and bisexual youth, and had been a peer counselor and youth services task force member at the Whitman–Walker Clinic. Thus, both men, besides being open and honest about their sexual orientation, had became leaders and acquired at least some public visibility in organizations " 'in their community,' "

*Dale,* 530 U.S. at 653, 120 S.Ct. 2446, committed to gay causes.

The relevance of all this, we repeat, is only—but critically—to show why Geller and Pool cannot be distinguished from Dale in assessing whether their presence as adult leaders in Scouting would significantly burden the Boy Scouts' right not "to accept members where such acceptance would derogate from the organization's expressive message." *Dale,* 530 U.S. at 661, 120 S.Ct. 2446. Accentuating minor differences in degree between their "activism" and Dale's not only would not distinguish the cases meaningfully, but would arguably do a disservice to all three protagonists—depicting Dale as more of an activist (at least in the sense of conveying militancy) than he in fact was, and Geller and Pool as less publicly committed than they have shown themselves to be in advocating for equal acceptance of gay men in the Boy Scouts and elsewhere. In short, reconstructing *Dale,* as the intervenors would have us do, to make it appear that the Court resolved the First Amendment balance more grudgingly in the Boy Scouts' favor than it did is not a proper role of the Commission or this court.

For the reasons stated, the Supreme Court's decision in *Dale* controls this case, and therefore the decision and order of the Commission must be

*Reversed.*

REID, Associate Judge, concurring.

I join Judge Farrell's opinion because I agree that "[this] case cannot be distin-

---

**10.** The Commission found "no indication in the record that Mr. Pool meeting with the ACLU and its agreement to be a counsel [were] based on the protest policies of Queer Nation."

**11.** The Commission did not disagree with but also attached no significance to the fact that Pool had made himself a "tester" in challeng-

ing what he considered the Boy Scouts' discriminatory policy. We do not imply, any more than did the Supreme Court in *Dale,* that Geller or Pool crossed the threshold of "activism" simply by filing suit challenging their exclusion from membership in the Boy Scouts.

guished from *Dale* on First Amendment grounds." I write separately to emphasize two aspects of the Supreme Court's opinion in *Dale*.

First, the *Dale* majority characterizes the Boy Scouts of America ("BSA") as "a private not-for-profit organization engaged in instilling its system of values in young people." *Dale, supra,* 530 U.S. at 643, 120 S.Ct. 2446. Undoubtedly parents of boy scouts entrust scoutmasters to play a role in the education and socialization of their sons, and in turn expect their sons to inculcate the value system articulated by the BSA. This view of the BSA's role reflects a predominantly expressive organization, and does not take into consideration the range of BSA's commercial activities which might be evident in another context or case, to such an extent that the BSA would be perceived as a predominately commercial organization. *See Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (O'Connor, J., concurring); *see also* Neal Troum, *Expressive Association and the Right to Exclude: Reading Between the Lines in Boy Scouts of America v. Dale,* 35 CREIGHTON L. REV. 641 (2002).

Second, the *Dale* majority declared that the court "must … give deference to an Association's view of what would impair its expression." Nonetheless, Chief Justice Rehnquist, speaking for the majority, added the following caveat: "That is not to say that an expressive association can erect a shield against antidiscrimination laws simply by asserting that mere acceptance of a member from a particular group would impair its message." *Dale, supra,* 530 U.S. at 653, 120 S.Ct. 2446. Although we do not address the District of Columbia Human Rights Act issue presented in this case, I believe that this court should keep the *Dale* majority's caveat in mind since it may become pertinent in a future case presenting a different context.