Filed 12/10/21  Bryan v. LQR Golf CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

SCOTT BRYAN et al.,

  Plaintiffs and Appellants,

v.

LQR GOLF, LLC,

  Defendant and Respondent.

E073117

(Super.Ct.No. PSC1704073)

OPINION

APPEAL from the Superior Court of Riverside County.  Kira L. Klatchko, Judge.  Affirmed.

Knighten & Parlow and Daniel M. Parlow for Plaintiffs and Appellants.

Burke, Williams & Sorensen, Daniel W. Maguire and Nancy Jerian Marr for Defendant and Respondent.

This appeal arises from a dispute concerning a private golf club's right to reject an application for membership.  Plaintiffs and appellants Scott and Carmella Bryan owned two residential properties (a home and a condominium) in the same golf community, but

1

only their home had premium membership privileges at the private golf course and club owned and operated by defendant and respondent LQR Golf, LLC, (the club) erroneously sued as Hilton Franchise Holding, LLC.  After selling their home and transferring their premium membership to the purchasers, plaintiffs applied for a new, lower category of membership as owners of a condominium.  Their application was rejected, and they sued for declaratory relief and damages.

The club moved for summary judgment, arguing it "has absolute discretion to select its own members."  The trial court agreed and granted their motion, determining as a matter of law it could not "compel [the club] to offer [plaintiffs] membership under the undisputed facts of this case, which do not raise Constitutional concerns."  Judgment was entered in the club's favor.  For the reasons stated *post*, we agree with the trial court and affirm the judgment.

## I.  PROCEDURAL BACKGROUND AND FACTS

The club owns and operates the Citrus Club, a private golf course and club in La Quinta, California.  It sells memberships, or revocable licenses, to use its facilities; the relationship between the club and its members is governed by the membership plan and related rules and regulations.  As a private club, membership is limited, and the facilities are not open for public business; funding is through membership dues.

In 2001, plaintiffs purchased a home in the residential community where the club operates, and obtained a refundable "Resident Heritage Golf Membership," paying an

2

$80,000 initiation deposit.[1]  Thirteen years later, in 2014, they purchased a condominium (for investment purposes) in the same residential community, without purchasing a second golf membership.[2]

In March 2017, plaintiffs decided to sell their home and golf membership. Because they were retaining ownership of the condominium, they planned to purchase a nonrefundable "Resident Heritage Golf Membership" for $30,000.  They informed the club about their plan.  In response, the club offered two options:  (1) plaintiffs could transfer their golf membership to the condominium or (2) they could obtain a refund of a portion of their current membership (approximately $64,000) and buy a new membership (by virtue of their ownership of the condominium) for $72,192 ($30,000 plus back dues and trail fees of $42,192).  These options were confirmed in the June 26 and June 28, 2017 letters from Ryan T. Deihl, the club's attorney.  In response, plaintiffs sought to pass along the "back dues" cost to the prospective purchasers of their home; however, when the prospective purchasers refused to absorb this extra cost, escrow failed. Unwilling to bear the cost of the back dues themselves, plaintiffs declined both options

---

[1]  Section 3.2 of the membership plan, entitled, "**INITIAL PURCHASERS IN A LA QUINTA CLUB COMMUNITY**," provides that Heritage and Citrus Golf memberships are offered, subject to availability, to the initial purchasers of lots or homes in the residential community "until 30 days after the closing on the purchase" of the lot or home.

[2]  According to Section 3.8 of the membership plan, entitled, "**OWNERSHIP OF MULTIPLE RESIDENTIAL LOTS OR HOMES**," when a person owns two or more residential lots or homes in a La Quinta club community, "the purchaser must obtain membership privileges for each residential lot or home purchased if membership privileges are to be associated with each such residential lot or home.  The Club does not guarantee the availability of a Membership at a later date."

3

offered by the club.  Unable to get the club to retract its demand for back dues, plaintiffs initiated this action for declaratory relief on July 28, 2017, and later amended the complaint on December 1, 2017.

Plaintiffs subsequently sold their home in January 2018, transferred their membership to the new owners, received (and cashed) a refund of their deposit in the amount of $64,000 (less their account balance), and acknowledged that "by opting to receive a refund [they] no longer have Membership privileges at the Citrus Club."  The next day, plaintiffs applied for a nonrefundable membership and tendered the fee of $30,000, without including the back dues of $42,192.  The application specifically stated: "*Memberships are contingent upon approval by The Club, which approval shall be at its discretion.*"  (Italics added.)

On February 1, 2018, plaintiffs filed a second amended complaint (SAC) alleging that a "dispute exists concerning [their] right [to] purchase a new non-refundable Club golf membership for $30,000 rather than the $72,192 which the Club is demanding from [them] as [a] condition for membership."  The SAC seeks damages and requests an "order stating that [they] can purchase a non-refundable golf membership in the Club for $30,000."

On February 14, 2018, the club rejected plaintiffs' application for a nonrefundable golf membership and returned it with their $30,000 check.  Seven months later, it moved for summary judgment on plaintiffs' action on the grounds the case is moot by virtue of

the fact that they "are no longer members, and have deprived themselves of standing to seek a declaration of membership rights." Plaintiffs opposed the motion. On March 14, 2019, the trial court stated that the motion "seem[ed] deficient" because the problem is not that plaintiffs "are not members," rather, the problem is "what relief is available" to them because the court may not "order the club to make them members." The court questioned whether the motion for summary judgment should be treated as a motion for judgment on the pleadings. The matter was continued to March 21, and the parties were asked to brief the following issue: "What is the legal authority to order the declaratory relief pleaded in the complaint," specifically to order "that plaintiffs can purchase a nonrefundable golf membership for $30,000?"

By way of supplemental briefing, plaintiffs asserted the trial court "has the legal authority to make [them] members of the Club" because plaintiffs accepted an offer of membership evidenced in "Ryan Diehl's letters," but challenged the terms (payment of

5

back dues) as a violation of the membership plan and the bankruptcy term sheet.[3]  But for

the offer of membership, plaintiffs acknowledged that the club was "not obligated to offer

**3**  Prior to 2011, the club's successor had filed for "Chapter 11 protection" under the Bankruptcy Code (11 U.S.C. § 1101 et seq.) and, by way of a settlement, the membership plan was revised.  According to the SAC, the "provisions governing the sale of a Heritage Golf Membership are laid out in 'Settlement Terms' 6 and 8 of the PGA West and Citrus Club Membership Settlement Term Sheet" that was attached to the "Order Approving Settlement Agreement With Members of the Club at PGA West and the Citrus Club signed and filed August 17, 2011 . . . Case No. 11-10372 (SHL) in the United States Bankruptcy Court Southern District of New York."

Settlement term No. 6, governing "Refunds upon Resignation," in relevant part, provides:  "Any Refundable Initiation Deposit refunded on account of a member's resignation (whether for a member currently on the resign list or a current member in good standing who joins the resign list at a later date) shall be paid at an amount equal to 50% (the 'Resignation Refund Percentage') of the Refundable Initiation Deposit otherwise entitled to refund under the terms of the Membership Plan; provided that, starting in 2013, the Resignation Refund Percentage shall increase by 5% for each full year that a member is active and in good standing from 2012 to 2021."

Settlement term No. 8, governing "Home Sales," in relevant part, provides:  "Member home sales to buyers that join a Club in the same or greater class of membership ('Home Buyers') (whether or not the membership sold is refundable) shall continue to enjoy the 1:1 refund ratio as provided in the Membership Plan, provided that the amount of the Refundable Initiation Deposit refund paid to the selling member ('Home Sale Refund') shall be subject to and multiplied against the Resignation Refund Percentage then applicable (*e.g.*, a selling member in good standing in 2016 shall receive 70% of his/her Refundable Initiation Deposit).  [¶] . . . [¶]  For any single year, the amount of Citrus Club's net Home Sale Refunds (*i.e.*, aggregate Home Sale Refunds less aggregate collections from membership sales to Home Buyers) shall not exceed $85,000 (the 'Citrus Annual Home Sale Refund Cap').  A maximum of $85,000 of one year's unused portion of the Citrus Annual Home Sale Refund Cap (*i.e.*, that year's $85,000, plus any carryover from the previous year, minus that year's net Citrus Club Home Sale Refunds) will carry over and be added to the next year's Citrus Annual Home Sale Refund Cap.  [¶]  To the extent that a Club's Home Sale Refunds exceed the applicable annual home sale refund cap in a given year, any Home Sale Refunds not paid in such year will be given priority over the following years' claimed Home Sale Refunds."

The settlement term sheet relating to the settlement agreement between the club and its members, and approved by the bankruptcy court, was incorporated into the membership plan and referenced in section 10.7, which required approval by the advisory board of governors.  However, modification of the "provisions of the Membership Plan and the Rules and Regulations" by the club was not subject to approval of the board.

to sell [them] a membership." In response, the club argued that it "has absolute discretion to select its own members because it is a private club protected by the First and Fourteenth Amendments to the Constitution. . . . There is no allegation that the back dues offer was made for discriminatory reasons (race, gender, etc.). And, Plaintiffs have no right to purchase a late membership, more than 30 days after close of escrow under the Membership Plan." The club cited *Roberts v. United States Jaycees* (1984) 468 U.S. 609 and *Warfield v. Peninsula Golf & Country Club* (1995) 10 Cal.4th 594 (*Warfield*).

At the hearing on March 26, 2019, the trial court asked plaintiffs' counsel what effect a court order, stating that the club is not allowed to charge plaintiffs back dues and trail fees, would have when the club may still deny them membership for any reason. Acknowledging the court's inability to compel the club to accept plaintiffs' application for membership, counsel argued that the court's order would clarify the requirements set forth in the membership plan. The court maintained that such order would have "no legal impact" on plaintiffs.

After taking the matter under submission, the trial court granted summary judgment in favor of the club. The court explained that, as a matter of law, it could not "grant [plaintiffs] the relief they seek" because it "cannot compel [the club] to offer [plaintiffs] membership under the undisputed facts of this case, which do not raise Constitutional concerns." The court had provided the parties with the opportunity to brief the issue of "whether [plaintiffs] could obtain relief on any theory," specifically, whether they have a "right to a declaration that they can purchase a membership for $30,000." The court noted that while plaintiffs claimed "that they have a right to a declaration

7

stating that the Club must comply with its governing documents[, they] do not provide any authority to support [their] proposition." The court found their claim for damages exceeding $70,000 was not "fairly encompassed" within the SAC, and their "opposition papers cannot create issues outside the pleadings and are not a substitute for amendment." Moreover, the court concluded that it "would be futile to allow [plaintiffs], at this point in the litigation, to amend their pleadings to add an additional cause, or causes, of action for damages because the undisputed facts are that the damages alleged resulted from [plaintiffs'] own conduct and not from any malfeasance or misfeasance by the [club]." Further, the court explained that plaintiffs had not "articulated any legal or factual basis to hold [the club] liable for the delay in the sale of [their] property—which delay was caused by [their] attempt to pass along the increased cost of a new Club membership to the buyer already in escrow to buy their property." Finally, the court determined that plaintiffs had not "articulated any legal or factual basis to hold the [club] responsible for damage to [their] 'friendships' and 'social lives,'" they had not alleged defamation, and they had not requested to amend their pleading in response to the motion for summary judgment. Judgment was entered on April 16, 2019.

Plaintiffs moved for reconsideration and attached a proposed third amended complaint alleging, inter alia, breach of contract, negligence, and fraud. Their motion was denied on the grounds there were no new facts, circumstances, or law to support reconsideration.

## II. DISCUSSION

### A. *Motion for Summary Judgment.*

Plaintiffs contend the trial court erred in granting the club's motion for summary judgment because the constitutional "freedom of association" has "very limited application to 'commercial' clubs like LQR." They argue that "the record contains no support for a finding that [the club] is an actual 'private club' for Constitutional freedom of expressive association purposes" because it "is not member-owned or member-controlled," it operates for profit, and it "has no expressive purpose nor any other purpose related to the freedom of association." We conclude the trial court properly granted the club's motion.

"An order granting summary judgment is reviewed de novo. [Citation.] As a practical matter, "'we assume the role of a trial court and apply the same rules and standards which govern a trial court's determination of a motion for summary judgment."' [Citation.] A motion for summary judgment is properly granted 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (*Doe v. Good Samaritan Hospital* (2018) 23 Cal.App.5th 653, 661.)

Summary judgment is appropriate in a declaratory relief action when only legal issues are presented for the court's determination. (*Gafcon, Inc. v. Ponsor & Associates* (2002) 98 Cal.App.4th 1388, 1401-1402.)

9

We begin by considering whether the club is a private club or a commercial club. If it is a private club, then the trial court correctly concluded that it could not interfere with its right to associational privacy. (*Warfield*, *supra*, 10 Cal.4th at p. 616 ["the right of nondiscriminatory access to places of public accommodation [is] a fundamental civil right but . . . such protection against discrimination [does] not extend to access to another person's home or private club or, in general, to 'social relations'"].)

"The right of associational privacy is well established by decisions of the United States Supreme Court and the California Supreme Court. . . . [A]ssociational privacy rights are not limited to associations that are '"politically oriented"' or '"advocacy organizations."' 'Forms of "association" have been protected that are not political in the customary sense but pertain to the social, legal, and economic benefit of the members. [Citation.]' [Citations.] [¶] Associational privacy rights extend to applications for membership. The right to apply for membership without governmental scrutiny is a natural adjunct to the right of associational privacy." (*Olympic Club v. Superior Court* (1991) 229 Cal.App.3d 358, 361-362 ["an 'intrusion into associational privacy may be sanctioned only upon the demonstration of a very important, indeed "compelling," state interest'"]; see *Board of Directors of Rotary International et al. v. Rotary Club of Duarte et al.* (1987) 481 U.S. 537 (*Rotary International*) [application of business establishment criteria under the Unruh Civil Rights Act does not violate the members' 1st Amend. associational rights].)

The associational rights the club asserts are subject to the same kind of factual inquiry applicable to a determination of the privacy status of other defendant entities. "Whether the 'zone of privacy' established by the First Amendment extends to a particular club or entity requires a careful inquiry into the objective characteristics of the particular relationships at issue." (*Rotary International*, *supra*, 481 U.S. 547, fn. 6.) In the context of examining intimate associational rights, the factors that may be relevant include "(1) the selectivity of the group in the admission of members, (2) the size of the group, (3) the degree of membership control over the governance of the organization (and particularly the selection of new members), (4) the degree to which club facilities are available for use by nonmembers, and (5) whether the primary purpose served by the club is social or business." (*Warfield*, *supra*, 10 Cal.4th at p. 620; see *Roberts v. United States Jaycees*, *supra*, 468 U.S. at p. 620.)

Here, the evidence demonstrates that the club's membership is selective and restricted in number.[4] The club's facilities are available for recreational purposes

---

[4] Section 2.7 of the membership plan, entitled, "**NUMBER OF MEMBERSHIPS AT THE CLUB**," permits "350 Heritage Golf and Citrus Golf Memberships . . . for each private, full 18-holes reserved for Golf Members, plus a proportionate number of Memberships for those portions of the Club's resort courses which are reserved for Member play . . . during peak season."

Section 3.1 of the membership plan, entitled, "**ELIGIBILITY FOR MEMBERSHIP**," provides that memberships are available "only upon the completion and submission of an Application for Membership to purchasers of lots or homes in a La Quinta Club Community, and such other persons as the Club determines appropriate from time to time. Applicants may be required to complete an interview with the Membership Director, subject to all applicable Club Rules and Regulations and state and federal laws."

only,[5] funded through membership dues, and are not open to the public, with the

exception of resort guests, member guests, promotional use, and tournament or group

play.  Memberships are available to initial and resale purchasers of lots or homes in a La

Quinta club community (until 30 days after closing escrow on the property), along with a

select group of persons the club deems appropriate from time to time.[6]  Membership

applications must be approved by the club and applicants may be required to "interview

with the Membership Director, subject to applicable Rules and Regulations and state

---

[5]  Section 10.6 of the membership plan, entitled, "**MEMBERSHIPS AT THE CLUB ARE OFFERED ONLY FOR RECREATIONAL PURPOSES**," provides: "MEMBERSHIPS AT THIS CLUB ARE BEING OFFERED EXCLUSIVELY FOR THE PURPOSE OF PERMITTING MEMBERS THE RECREATIONAL USE OF THE CLUB FACILITIES.  MEMBERSHIPS SHOULD NOT BE VIEWED AS AN INVESTMENT AND NO MEMBER SHOULD EXPECT TO DERIVE ANY ECONOMIC PROFITS FROM MEMBERSHIP AT THE CLUB.  [¶]  NO FEDERAL OR STATE AUTHORITY HAS PASSED UPON OR ENDORSED THE MERITS OF THIS MEMBERSHIP PLAN."

[6]  Section 3.2 of the membership plan (see fn. 1, *ante*).  Also, section 3.3 of the membership plan, entitled, "**RESALE PURCHASERS IN A LA QUINTA CLUB COMMUNITY**," governs memberships offered to resale purchasers of lots and homes. Heritage and Citrus Golf memberships are offered, subject to availability, to resale purchasers of lots or homes, "until 30 days after the closing on the purchase of the property."  However, after the 30-day period, "the Club shall have no obligation to offer" a membership to a resale purchaser, who may no longer have the ability to purchase an unlimited golf privileges membership.
Section 3.4 of the membership plan, entitled, "**RESERVED MEMBERSHIPS**," states that the club reserves memberships, which it may offer "in its sole discretion" to "select initial purchasers of new lots or homes in the La Quinta Club Community, or to selected invitees of the Club."

12

and federal laws."[7]  Members are allowed to upgrade their membership to a higher category; however, downgrading is only permitted when a member dies.[8]  Plaintiffs were aware of, and agreed to, the club's rules by virtue of the membership they purchased in connection with the purchase of their home.[9]

According to the undisputed facts concerning the objective characteristics of the relationship between the club and its members, the club is a private club entitled to constitutional protection for the decisions of its membership director.  (*Rotary International*, *supra*, 481 U.S. at p. 547, fn. 6; *Warfield*, *supra*, 10 Cal.4th at p. 621; cf. *Tillman et al. v. Wheaton-Haven Recreation Assn.*, *Inc.*, *et al.* (1973) 410 U.S. 431, 438 [organization whose only selection criterion is race has "'no plan or purpose of exclusiveness'" that might make it a private club exempt from federal civil rights statute].)  As such, the club was entitled to reject plaintiffs' application for membership

---

[7]  Section 7 of the membership plan, entitled, "**APPLICATION FOR MEMBERSHIP**," requires an applicant to deliver his or her application to the membership director, who may interview the applicant as part of the club's process in determining whether to approve the application.

[8]  Section 3.9 of the membership plan, entitled, "**MEMBERS MAY UPGRADE TO A HIGHER CATEGORY OF MEMBERSHIP**," allows the right to upgrade "to a higher category of Membership" if available.
Section 3.10 of the membership plan, entitled, "**DOWNGRADE OF MEMBERSHIP**," prohibits downgrading a membership "except in the event of the death of a Member."

[9]  Section 7.3 of the membership plan, entitled, "**THE RIGHTS OF MEMBERS TO USE THE CLUB FACILITIES ARE GOVERNED ONLY BY THIS MEMBERSHIP PLAN**," in relevant part provides:  "If approved for Membership in the Club, the Member agrees to be bound by the terms and conditions of the Membership Plan and the Rules and Regulations of the Club, as amended from time to time. . . ."

13

for any legitimate nondiscriminatory reason. Plaintiffs do not contend their application was rejected for a discriminatory reason, nor do we discern any evidence that it was. The club simply exercised its discretion and rejected plaintiffs' application. Accordingly, the trial court correctly concluded that it could not "compel [the club] to offer [plaintiffs] membership."

Notwithstanding, *ante*, plaintiffs cite the case of *Youngblood v. Wilcox* (1989) 207 Cal.App.3d 1368, 1373 (*Youngblood*) and assert that the club's membership decisions are "not entitled to immunity from judicial review." In *Youngblood*, the plaintiffs purchased a lifetime membership in a golf club; however, six years later, the president of the club notified them that their membership was being terminated. (*Id*. at p. 1371.) Plaintiffs alleged the termination was retaliatory. (*Id*. at p. 1372.) This court affirmed a preliminary injunction restraining the club from interfering with the plaintiffs' rights as lifetime members pending a determination of whether they were wrongfully expelled. (*Id*. at pp. 1374-1376.)

Plaintiffs' reliance on *Youngblood* is misplaced. Here, the club did not terminate plaintiffs' membership. Instead, plaintiffs voluntarily relinquished their golf membership in 2018 and then applied for a new, downgraded membership based on their 2014 purchase of a condominium. It was within the club's discretion to approve their late

14

application; however, it did not. Plaintiffs never alleged that their application was wrongfully rejected nor did they present any evidence to support such an allegation.[10]

Moreover, application of *Youngblood*, *supra*, 207 Cal.App.3d 1368, to the facts before this court is tantamount to allowing golf club members to play fast and loose with the rules that govern their memberships. Here, the membership plan does not allow members to downgrade their membership. Nonetheless, that is exactly what plaintiffs sought to do by refusing to transfer their premium golf membership from their home to their condominium and, instead, including it in the sale of their home. This action provided them with an approximately $64,000 refund. With this money in hand, plaintiffs then applied for a downgraded $30,000 membership. The fact that they are no longer members of the club is not because of any illegal action on the part of the club.

---

[10] In their reply brief, plaintiffs note that *Youngblood* cited to two "'private association'" cases, which affirmed the issuances of a preliminary injunction against a club that sought to expel a member: *Nyman v. The Desert Club* (1952) 109 Cal.App.2d 63, 66 (preliminary injunction issued to restrain a private club from interfering with the full use and enjoyment of the club facilities pending a determination of the case on the merits); and *Curran v. Mount Diablo Council of the Boy Scouts* (1983) 147 Cal.App.3d 712, 720 ("Under common law, relief was afforded to any individual expelled from a private association who could demonstrate (1) that the society's rules or proceedings were contrary to 'natural justice,' (2) that the society had not followed its own procedures, or (3) that the expulsion was maliciously motivated.") These cases are distinguishable because they are based on claims of wrongful expulsion.

Rather, it is due to their own actions in selling their membership and then attempting to buy a new one at less than half the price, despite being told that they could not do this.[11]

For the reasons stated, *ante*, the trial court correctly granted summary judgment in favor of the club since it could not be forced to offer plaintiffs a membership.

*B. Denial of Leave to Amend.*

Plaintiffs contend the trial court erred in denying their request for leave to amend the SAC "in order to state more clearly the causes of action for damages which would survive the [court's] finding that [the club's] membership decisions were immune from judicial review."[12] According to plaintiffs, because the trial court "converted [the club's] motion for summary judgment into a motion for judgment on the pleadings and granted

---

[11] Assuming that the club's membership decisions are subject to judicial review, plaintiffs contend that the club violated the membership plan by refusing to accept their application after they "satisfied all requirements to acquire a non-refundable Citrus Golf Membership" by owning a home within the residential community and submitting an application with a $30,000 deposit. We disagree. According to the membership plan, memberships are offered to purchasers of lots or homes in the residential community up until 30 days after closing escrow. Residents who fail to obtain membership privileges prior to the 30-day expiration are considered late applicants who have no right to membership. Nonetheless, the club is willing to consider late applications, if the applicants agree to pay "back dues" in addition to the deposit. The amount of back dues is calculated "from . . . 30 days after [the applicants'] home closes, to the time they [come] in to join." Nothing in the membership plan prevents the club from requiring the payment of back dues for late applicants, and the club offered a legitimate business purpose for doing so, namely, to force home purchasers to make a timely decision, rather than risk losing them to another area golf club by keeping the offer open indefinitely.

[12] Plaintiffs treat the trial court's order as if it is an order granting judgment on the pleadings. While the court initially questioned whether the club's motion for summary judgment was a motion for judgment on the pleadings, it ultimately treated it as a motion for summary judgment. We do the same.

16

that motion, . . . there is a particularly heightened preference for granting leave to amend." As we explain, *post*, plaintiffs' contention lacks merit.

To begin with, we are not reviewing a motion for judgment on the pleadings.[13] The trial court specifically stated, "[S]ummary judgment is appropriate because [plaintiffs] are not entitled to relief on the claims pleaded." We therefore consider whether the court abused its discretion in denying plaintiffs' request to file a third amended complaint in response to the motion.

A trial court has wide discretion, "in furtherance of justice," to "allow, upon any terms as may be just, an amendment to any pleading." (Code Civ. Proc., § 473, subd. (a)(1).) This discretion exists up to and even during a trial, but "'only "[w]here no prejudice is shown to the adverse party."'" (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761.) We review the denial of a request to amend for an abuse of discretion. (*Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168, 175.) Courts have consistently held that a trial court does not abuse its discretion in denying a request for leave to amend made for the first time at the hearing on a motion for summary judgment. (*Falcon v. Long Beach Genetics, Inc.* (2014) 224 Cal.App.4th 1263, 1280-1281; *580 Folsom Associates v. Prometheus Development Co.* (1990) 223 Cal.App.3d 1,

---

[13] By asserting that the trial court treated the motion as one for judgment on the pleadings, it appears that plaintiffs hope to take advantage of the "'great liberality . . . used in allowing amendments'" to pleadings in response to a motion for judgement on the pleadings. (*Higgins v. Del Faro* (1981) 123 Cal.App.3d 558, 565 ["A motion for judgment on the pleadings is treated from a legal standpoint the same as a general demurrer, consequently the facts alleged in the complaint must be assumed to be true and liberally construed in favor of the party against whom the motion is made."].)

18; *Shugart v. Regents of University of California* (2011) 199 Cal.App.4th 499, 508; *Liebert v. Transworld Systems*, *Inc*. (1995) 32 Cal.App.4th 1693, 1699; *Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 90; *Distefano v. Forester* (2001) 85 Cal.App.4th 1249, 1264-1265.) To allow plaintiffs to defeat summary judgment by changing the pleading at the eleventh hour is "'patently unfair'" because it allows plaintiffs to present a "'"moving target" unbounded by the pleadings.'" (*Falcon*, at p. 1280.)

Here, plaintiffs failed to request leave to file a third amended complaint in response to the motion for summary judgment. Rather, at the March 26, 2019 hearing, their counsel acknowledged that "the prayer . . . is deficient" and indicated "[t]here's a new complaint that we would like to submit that only changes the prayer. We're looking for a declaration from the Court that just says [the club] cannot . . . require the payment of back dues absent some kind of amendment to the membership plan." The trial court denied the request to change the prayer as untimely[14] and concluded that any declaration proscribing the imposition of back dues has "no legal effect" on the club's decision to reject plaintiffs' application. On appeal, plaintiffs have not shown that the court abused its discretion in concluding that they could not state a viable cause of action for declaratory relief. Thus, the request to amend the SAC's prayer was properly denied.

---

**14** The court stated: "[T]he problem is that the pleadings are what they are. At this point we're not in a demurrer stage. This is a summary judgment reviewing the supplemental brief that was presented by both sides. You really have a whole new case that you're wanting to put forward. It's not just a matter of amending the prayer. . . . At this point maybe you were not the one who did the pleading, but the pleading is deficient. It's a little late . . . to just start from scratch. That's really what you're attempting to do. It's a whole different action that you want to plead now."

18

Alternatively, in their reply brief, plaintiffs contend the trial court erred in denying their motion for reconsideration, which also requested leave to file a third amended complaint. We find no error.

Pursuant to Code of Civil Procedure section 1008, a court may reconsider a prior order; however, a motion for reconsideration must be based on "new or different facts, circumstances, or law" and accompanied by a declaration stating what "new or different facts, circumstances, or law are claimed to be shown." (Code Civ. Proc., § 1008, subds. (a)-(b), (e).) "According to the plain language of the statute, a court acts in excess of jurisdiction when it grants a motion to reconsider that is not based upon 'new or different facts, circumstances, or law'" (*Gilberd v. AC Transit* (1995) 32 Cal.App.4th 1494, 1500), or when the moving party failed to provide "'a satisfactory explanation for the failure to produce that evidence at an earlier time'" (*Garcia v. Hejmadi* (1997) 58 Cal.App.4th 674, 689).

Here, there were no new facts, circumstances, or law to support granting leave to file a third amended complaint. The facts—alleged in the proposed third amended complaint—were within plaintiffs' knowledge when the action was first filed. More importantly, the facts continue to fail to support any cognizable claim for relief because the trial court may not order the club to accept plaintiffs' application for membership. Furthermore, any monetary damages suffered by plaintiffs were the result of their own actions, not the club's. As previously noted, plaintiffs decided to sell their premium golf membership, collect a refund, and take a chance that the club would approve their

19

application for a downgraded membership, rather than simply transfer their golf membership from their home to their condominium.

In short, the trial court properly denied plaintiffs' request to file a third amended complaint.

<h3 style="text-align:center">III.  DISPOSITION</h3>

The judgment is affirmed.   Defendant and respondent LQR Golf, LLC, shall recover its costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER_____<br>J.

We concur:


RAMIREZ_____<br>P. J.


RAPHAEL_____<br>J.